Donna Etemadi, Bar No. 354563
Etemadi Legal Group PC
137 Pineview
Irvine, CA 92620
Telephone: (323)688-0616
E-Mail: donna@elglaw.co

*Attorney for Plaintiff*
Jeremy Ryan

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JEREMY RYAN, a California individual, )   Case No.: 3:24-cv-3553
        Plaintiff, )
     vs. )   **COMPLAINT FOR:**
   )     1.  **BREACH OF CONTRACT**
X CORP., a Nevada corporation, )     2.  **PROMISSORY ESTOPPEL**
     Defendant )     3.  **UNJUST ENRICHMENT**
   )     4.  **INTENTIONAL INTEREFERENCE WITH PLAINTIFF'S CONTRACTUAL RELATIONSHIPS WITH THIRD PARTIES**
   )     5.  **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
   )     6.  **PROMISSORY FRAUD**
   )     7.  **CONVERSION**
   )     8.  **FALSE ADVERTISING AND UNFAIR BUSINESS PRACTICES**

_____   **DEMAND FOR JURY TRIAL**

## PARTIES

1.  X Corp. ("X") is a Nevada corporation with a principal place of business located at 1355 Market Street, Suite 900, San Francisco, CA 94103.

2.  Jeremy Ryan is a resident of the State of California.

## JURISDICTION

3. X is a citizen of Nevada and California. Jeremy Ryan is a citizen of California. X and Jeremy Ryan have completely diverse citizenship. Plaintiff is seeking damages in excess of $75,000. This Court has subject matter jurisdiction over this case under 28 U.S.C. §1332.

4. X's headquarters are in San Francisco, California. This Court has general personal jurisdiction over X under the Due Process Clause of the Fourteenth Amendment. This Court also has jurisdiction over Twitter pursuant to California's Long-Arm Statute, Cal. Code. Civ. Proc. §410.10, which provides that "[a] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

**VENUE**

5. Venue is proper in this judicial district under 28 U.S.C. §1391 because X's headquarters are in this judicial district. Further, X's Terms of Service ("Terms") provide that "[a]ll disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco, County, California, United States…"

**DIVISIONAL ASSIGNMENT**

6. Pursuant to Civil L.R. 3-2(c), this case should be assigned to the San Francisco division because a substantial portion of the events giving rise to this case occurred at X's corporate headquarters located in San Francisco.

**FACTUAL BACKGROUND**

*"Content moderation is like a digital chastity belt, keeping the internet from experiencing the full range of human expression… So…embrace the chaos of the internet!"*

    – **Elon Musk, CEO of Defendant X, in a tweet on February 19, 2024**

## I.      X's Acquisition and the Subsequent Decline of Content Moderation Standards

7.  X, formerly Twitter, is one of the world's most predominant social media platforms and mediums for content creation, including creation that generates revenue and financial profit not only for the platform but for the creator as well.

8.  Despite the platform's announced commitment to "defending and respecting the user's voice" as one of its core values, it has repeatedly engaged in behavior contrary to this core value to the detriment of Plaintiff Jeremy Ryan. *Defending and respecting the rights of people using our services,* X, https://help.twitter.com/en/rules-and-policies/defending-and-respecting-our-users-voice.

9.  Businessman Elon Musk began a bid to acquire X, formerly Twitter, in April 2022.

10. X was officially acquired by Mr. Musk in October 2022 whereby the company underwent large-scale transformations, particularly on the subject of content moderation.

11. On October 27, 2022, the day before closing the deal, Mr. Musk wrote the following in a tweet sent out on the platform. "The reason I acquired Twitter is because it is important to the future of civilization to have a common digital town square, where a wide range of beliefs can be debated in a healthy manner, without resorting to violence…That said, Twitter obviously cannot become a free-for-all hellscape, where anything can be said with no consequences! In addition to adhering to the laws of the land, our platform must be warm and welcoming to all, where you can choose your desired experience according to your preferences, just as you can choose, for example, to see movies or play video games ranging from all ages to mature."

12. Mr. Musk's sentiment in his October 27, 2022 tweet mirrored beliefs he had expressed months prior, on March 4, 2022, wherein he described himself as a "free speech absolutist."

13. After closing the deal to acquire Twitter, on October 28, 2022 at 11:18 a.m., Mr. Musk sent out the following tweet on the platform stating that "Twitter will be forming a content moderation council with widely diverse viewpoints. No major content decisions or account reinstatements will happen before that council convenes."

14. In the months following Mr. Musk's acquisition of Twitter, reports surfaced that he had laid off dozens and even hundreds of content moderation staff. *See, e.g. Twitter layoffs slash content moderation staff as new CEO Elon Musk looks to outsource*, USA Today (Nov. 15, 2022), https://www.usatoday.com/story/tech/2022/11/15/elon-musk-cuts-twitter-content-moderation-staff/10706732002/#; *Musk fires outsourced content moderators who track abuse on Twitter*, CBS News (Nov. 14, 2022), https://www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/; *Twitter Cuts More Staff Overseeing Global Content Moderation*, Bloomberg (Jan. 7, 2023), https://www.bloomberg.com/news/articles/2023-01-07/elon-musk-cuts-more-twitter-staff-overseeing-content-moderation?embedded-checkout=true.

15. In April 2023, the company announced a "Freedom of Speech, Not Reach" policy, under which it began to limit the visibility of some tweets that violated its policies rather than removing the content from the site as was done previously. *See Musk-owned X's content moderation shift complicated effort to win back brands*, Reuters (Sep. 7, 2023), https://www.reuters.com/technology/musk-owned-xs-content-moderation-shift-complicated-effort-win-back-brands-former-2023-09-07/.

16. In June 2023, the company's head of brand safety and quality, AJ Brown, resigned. Mr. Brown built the team tasked with preventing ads from appearing next to unsuitable content. In his first interview after resigning from the company, Mr. Brown stated that "[h]elping

people wrap their minds around the concept that violating a policy would no longer result in the removal of whatever was violating the policy, was a difficult message to communicate to people." *See Musk-owned X's content moderation shift complicated effort to win back brands*, Reuters (Sep. 7, 2023), https://www.reuters.com/technology/musk-owned-xs-content-moderation-shift-complicated-effort-win-back-brands-former-2023-09-07/.

17. Issues surrounding content moderation and leadership continued at the company. In June 2023, it became clear that Mr. Musk not only had an active role in establishing content moderation policy at X, but he also had a record of intervening and overriding content moderation decisions at X. In June 2023, merely weeks before the company was scheduled to undergo a regulatory test by European Union officials for its handling of user content, the company's top content moderation official and head of trust and safety, Ella Irwin, left the company. Ms. Irwin's departure was partly due to a dispute in which the company had warned that the release of a certain documentary on the platform would be labeled as "hateful content", at which time Mr. Musk personally intervened and labeled the content moderation decision "a mistake by many people at Twitter". *See Twitter loses its top content moderation official at a key moment*, CNN Business (Jun. 2, 2023), https://www.cnn.com/2023/06/02/tech/twitter-content-moderation-official-eu/index.html.

18. In the following months, Mr. Musk and X engaged in repeated behavior that illustrated conflicting approaches to content moderation and a general lack of a cohesive policy on content moderation.

19. In September 2023, X sued the state of California to enjoin enforcement of Assembly Bill 587, a state law establishing new transparency rules for social media companies, requiring

them to publish their policies for policing disinformation, harassment, hate speech, and extremism. The company argued that the law violates its free speech rights under the U.S. Constitution's First Amendment and California's state constitution. *See Elon Musk's X Corp sues California to undo content moderation law*, Reuters (Sep. 8, 2023), https://www.reuters.com/legal/elon-musks-x-corp-sues-california-undo-content-moderation-law-2023-09-08/.

20.  The company's bid to enjoin enforcement of the law ultimately failed and its suit was dismissed in December 2023 with the presiding district judge stating that "[w]hile the reporting requirement does appear to place a substantial compliance burden on social media companies, it does not appear that the requirement is unjustified or unduly burdensome within the context of First Amendment law." *See Elon Musk's X fails to block California's content moderation law*, Reuters (Dec. 28, 2023), https://www.reuters.com/sustainability/society-equity/elon-musks-x-fails-block-californias-content-moderation-law-2023-12-29/#:~:text=X%2C%20formerly%20known%20as%20Twitter,Amendment%20and%20California's%20state%20constitution.

21. In a further illustration of X's laissez-faire stance on content moderation, on Monday, June 3, 2024, the company announced that the platform would officially allow pornographic content but block adult and violent posts from being viewable by users who are under 18 or who not opt-in to see it. The company has asked users who post adult content to voluntarily adjust their media settings so that their images and videos are put behind a content warning before they can be viewed. The company has further indicated that it would detect what users were posting and that if users do not mark pornographic posts

appropriately then "we will adjust your account settings for you." *See X changes porn policy to opt-in system that blocks under 18 users*, The Guardian (Jun. 3, 2024), https://www.theguardian.com/technology/article/2024/jun/04/x-twitter-porn-policy-under-18-opt-in#:~:text=2024%2021.19%20EDT-,Elon%20Musk's%20X%20now%20officially%20allows%20pornographic%20content%20on%20its,is%20viewable%20on%20the%20platform.

22. And while X announced this policy update on June 3, 2024, as of June 10, 2024, its Terms continue to include pornography as a category for which a user account may be reported and subsequently suspended.

23. X has repeatedly demonstrated that although its Terms contain an official policy for the suspension and appeal of accounts, corporate policy and practice often contradicts that and there is yet to be a cohesive and consistent content moderation policy.

24. X's haphazard and arbitrarily enforced policies and practices have led to the harm against Plaintiff Jeremy Ryan.

**II.     NFTs, Cryptocurrency, and Arbitrary Suspensions**

25. While cryptocurrency and NFT content is not a category under which a user's account may purportedly be reported and suspended under the X Terms, company practice has painted a different picture.

26. An NFT is a digital asset that can be in the form of art, music, videos, or more. They are purchased and sold online, frequently using cryptocurrency. They have become an increasingly popular method of buying and selling digital artwork.

27. NFTs exist on a blockchain, which is a distributed public ledger that records transactions. NFTs are typically held on the Ethereum blockchain. An NFT is created or "minted" from

digital objects that represent both tangible and intangible items, including collectibles, virtual avatars, and graphic art. Essentially, "NFTs are like physical collector's items, only digital. So instead of getting an actual oil painting to hang on the wall, the buyer gets a digital file instead." *What Is an NFT? Non-Fungible Tokens Explained*, Forbes Advisor (May 10, 2024), https://www.forbes.com/advisor/investing/cryptocurrency/nft-non-fungible-token/.

28. Blockchain technology and NFTs give artists and content creators, like Mr. Ryan, a unique opportunity to monetize their wares. For instance, artists no longer have to rely on galleries or auction houses to sell their act. Rather, the artist can sell it directly to the consumer as an NFT, which also lets them keep more of the profits. *What Is an NFT? Non-Fungible Tokens Explained*, Forbes Advisor (May 10, 2024), https://www.forbes.com/advisor/investing/cryptocurrency/nft-non-fungible-token/.

29. There are many cryptocurrency and NFT-related accounts on the X platform. Artists, marketers, entrepreneurs, and consumers have formed a niche community on the platform and maintain active accounts. However, many accounts have been subjected to haphazard and questionable suspension, with no explanation provided by the company.

30. In August 2022, shortly after Mr. Musk began the process of acquiring X, formerly known as Twitter, the company suspended access to nine accounts associated with promoting nonfungible tokens or NFTs, on the Solana ecosystem. The company gave no explanation for the suspensions. Shortly after the suspensions, the head of communications at the Solana Foundation, sent out a tweet on the platform "Hey Twitter, bring back @y00tlist; I've paused all Foundation adspend until they're back. Twitter's gotta reinstate them, or show solid cause for suspension." After this tweet, the said accounts were reinstated with

no explanation from the company on why they were suspended. *See Twitter brings back suspended NFTs accounts as Solana threatens to pause ad spend*, CoinTelegraph (Aug. 31, 2022), https://cointelegraph.com/news/twitter-brings-back-suspended-nfts-accounts-as-solana-threatens-to-pause-ad-spend.

31. When an executive at the Solana Foundation suspended the organization's spending for advertising on Twitter until the accounts were reinstated, they were reinstated without any further explanation.

32. After Mr. Musk officially acquired the company in October 2022, one of the changes implemented was a massive "unbanning" of previously banned Twitter users. Among those was a range of large and small accounts, including users promoting NFTs and cryptocurrencies. *See The mass unbanning of suspended Twitter users is underway*, CNN Business (Dec. 8, 2022), https://www.cnn.com/2022/12/08/tech/twitter-unbanned-users-returning/index.html. However, the company's vague and ambiguous policies on cryptocurrency and NFT accounts continued.

33. Mr. Musk has a documented record of personally tweeting about cryptocurrency, including which coins he prefers and comments on the latest trends.

34. On June 19, 2023, Twitter suspended the AI-powered account known as "Explain this Bob" after Mr. Musk labeled it a "scam cryto account". The account was taken down shortly after Mr. Musk's accusation. Strangely, just two months prior, Mr. Musk had tweeted "I love Bob" in response to one of the account's tweets. This tweet prominently appeared on the project's website. Nonetheless, two months later, the account was suspended with no explanation except that it was a "scam", according to Mr. Musk. It was reported that the suspension caused the price of the associated memecoin BOB to drop by over 30%. *See*

*Elon Musk Suspends 'scam Crypto Account' on Twitter*, BinanceSquare (Jun. 19, 2023), https://www.binance.com/en-IN/square/post/667998.

35. Additionally, in June 2023, the bot app of X user account called Shibburn, linked to the Shiba Inu project, was unexpectedly suspended. The Shibburn account app had gained significant traction among the cryptocurrency community for its engagement and updates related to Shiba Inu, especially about the coin's burn rates. The company did not provide a reason for its suspension. *See Shiba Inu Burn Account on Twitter Unexpectedly Suspended*, BinanceSquare (Jun. 25, 2023), https://www.binance.com/en/square/post/693141.

36. This Shibburn bot app is tied to the Shiba Inu cryptocurrency, which Mr. Musk has previously tweeted about on his personal account. Before he acquired X, in March 2021, Mr. Musk tweeted that he was getting a Shiba Inu. However, he did not specify whether he was getting the canine puppy or the cryptocurrency, which features an image of a cartoon dog. This was during a time when the Shiba Inu had reached record-high valuation. However, later that year, in October 2021, Mr. Musk revealed that he did not own any Shiba Inu coins, causing the cryptocurrency to lose 15% of its value in the following days. *See Shiba Inu Falls From Record After Musk Reveals His Crypto Buys*, Bloomberg (Oct. 24, 2021), https://www.bloomberg.com/news/articles/2021-10-25/shiba-inu-crypto-falls-from-record-after-musk-damps-speculation?embedded-checkout=true).

37. X has a pattern of unexpectedly suspending cryptocurrency and NFT related accounts with no explanation and some of these accounts are coins that Mr. Musk has personally purported to take an interest. However, many other cryptocurrency and NFT related accounts remain active on the platform and are never targeted.

38. X's mechanism for suspension of cryptocurrency and NFT accounts is also suspect.

39. In March 2023, the X user account belonging to Arbitrum, the Ethereum rollup platform was briefly suspended. The Arbitrum Foundation claimed that X flagged the account in error and it was reinstated within a few hours. According to a Arbitrum Foundation representative, Twitter Support explained that "[w]e have systems that find and remove multiple automated spam accounts in bulk, and yours was flagged as spam by mistake." The suspension was less than a week after the rollout of Arbitrum's new ARB governance token. *See Twitter Briefly Suspends Official Arbitrum Account*, CoinDesk (Mar. 27, 2023), https://www.coindesk.com/business/2023/03/27/twitter-suspends-official-arbitrum-account/.

40. X has demonstrated an arbitrary and suspect mechanism for the suspension of legitimate cryptocurrency and NFT platforms, much activity from which it receives a financial benefit in the form of advertising spending and user traffic.

### III.    Jeremy Ryan's Suspension from X as the largest NFT Artist on the Binance Smart Chain

41. After being diagnosed with and surviving brain cancer, in his recovery stage after a four-year battle, Mr. Ryan developed an interest and skill in art. Mr. Ryan channeled this newly-found interest and skill into a passion for creating digital art or Non-Fungible Tokens ("NFTs").

42. As a result of his efforts, within a very short period, Mr. Ryan became the largest NFT artist on the Binance Smart Chain in terms of minted NFTs, collections created, and fully minted collections with 10,000 pieces or more. He has created six incredibly successful collections.

43. Mr. Ryan created user accounts on the X platform and utilized the platform to not only further develop his cryptocurrency and NFT community, but also promote his NFT projects.

44. Mr. Ryan, his content, and his work was increasingly popular on the X platform, garnering the support and following of several high-profile celebrities, including actor and professional wrestler John Cena and rapper and record producer Calvin Cordozar Broadus Jr., professionally known as Snoop Dogg.

45. An example of Mr. Ryan's success is the waitlist for his upcoming NFT project which contains thousands of individuals waiting to purchase his NFT. The account associated with this project has been suspended.

46. Mr. Ryan's seven accounts @nftdemon_420, @gremlin_society, @badassdoggos, @patrolcrypt0, @schnauztrouse, @gamingshibanfts and @cryptopuppy420 have been suspended without any proper explanation or justifiable reason given to Mr. Ryan and without any ability to appeal, contrary to X's Terms, company policies, and representations. Despite 13 attempts to appeal just his @nftdemon_420 account, he has yet to be given an explanation for the suspension or even a response to one of his appeals. None of his accounts have been reinstated.

47. Mr. Ryan's suspension from the X platform has severely damaged his cryptocurrency and NFT business, including his upcoming NFT projects. As more time passes without access to his accounts and ability to promote his upcoming NFT projects or generate momentum, he continues to lose any prospective financial advantage or profits he had earned and was projected to earn while active on the X platform.

48. Mr. Ryan did not violate X's Terms, policies, or rules. Due to X's inconsistent and arbitrary content moderation policies, haphazard suspension of legitimate accounts that have engaged in no abusive or spam-like behavior, and refusal to provide any clarity or take remedial action after Mr. Ryan's repeated requests for evaluation of his suspension, Mr. Ryan has lost his predominant source of income and livelihood.

49. For the aforementioned reasons, Mr. Ryan brings this Complaint against Defendant X, seeking injunctive and compensatory relief for damages he has suffered and continues to suffer as a result of X's actions.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Breach of Contract

50. Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

51. The Terms and X's stated policies and procedures constitute a binding contract between X and Plaintiff.

52. The contract between X and Plaintiff is a contract of adhesion under California law.

53. Since X is the drafter of the terms of the contract between it and Plaintiff, the terms should be construed against the company.

54. X amended its Terms on September 29, 2023 to include several grounds on which a user's account could be reported for a potential violation of the Terms. Plaintiff did not engage in any such behavior, was never given an explanation on why his accounts were suspended and has not regained access to his accounts.

55. Pursuant to X's Terms, content must fall under a certain violation category and meet certain defined, objective criteria to be deemed a violation of the Terms and subject to suspension. X is bound to apply that policy objectively, uniformly, and rationally under California's duty of good faith and fair dealing, which requires, among other things "each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." *Egan v. Mut. Of Omaha Ins.*, 24 Cal. 3d 809, 818, 620 P.2d 141 (1979).

56. Plaintiff's activity and conduct on the X platform did not violate any of X's Terms or rules, as defined.

57. X breached its contract with Plaintiff by permanently suspending his account on the basis that he violated the company's Terms with no further explanation on the nature of this violation.

58. Plaintiff incurred damages on account of X's breach of contract.

59. X's breach of contract was intentional and willful.

60. Since X's actions against Plaintiff were at least willful and likely the result of gross negligence or fraud, the liability waiver the company includes in its Terms is unenforceable.

61. As a direct and proximate result of the Defendant's breach as described herein, Plaintiff has been damaged in an amount to conform to proof at trial.

62. WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

### Promissory Estoppel

63. Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

64. X, through the company's practices and procedures, its Terms, and notifications on Plaintiff's suspensions, made unambiguous personal promises and assurances to Plaintiff for an extended period, including but not limited to the following:

    a. X reserve[s] the right to remove Content that violates the User Agreement, including for example, "copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment." X Terms of Service, Main Page, September 29, 2023.

    b. "X's mission is to give everyone the power to create and share ideas and information, as well as express their opinions and beliefs without barriers. Free expression is a human right – we believe that everyone has a voice, and the right to use it." X Help Center, Abuse and Harassment, March 2024.

    c. "We also believe that criticism of institutions, practices, and ideas is a fundamental part of the freedom of expression and thus, we will not take action on such critical commentary." X Help Center, Abuse and Harassment, March 2024.

    d. "Your account is suspended. After careful review, we determined your account broke the X Rules. Your account is permanently in read-only mode, which means you can't post, Repost, or Like content. You won't be able to create new accounts. If you think we got this wrong, you can submit an appeal." X Suspension Notice

    e. "We received your request to have your account reinstated. Please respond to this email with the reason you believe your account suspension was in error and/or the reason you are requesting an appeal." X Support Email.

    f. Plaintiff received an email from X's Support Account requesting additional information on his appeal. When Plaintiff attempted to access the link and submit the

form, regardless of what he entered into the form, he continued to receive the original email from the X Support Account.

g.   In total, Plaintiff submitted 13 individual and separate appeals from April 2 until April 18. X did not respond to any of them, give him an explanation on why his accounts were suspended, or why they have yet to be reinstated.

h.   X purportedly gave Plaintiff an opportunity to appeal on the guise that the company was willing to review the basis on which his accounts were suspended and possibly reinstate. However, such representations were a ruse.

65. X's specific, personal promises to Plaintiff amplified the general promises under which X stated that it maintained a company policy on the suspension of user accounts for conduct occurring in violation of the Terms. X's statements support a promissory estoppel claim.

66. Further, X had specific knowledge of the nature and content of Plaintiff's tweets since the time he created his accounts and the company allowed him to build a community and business using his accounts without objection.

67. Plaintiff relied on X's promises and assurances by continuing to use the platform.

68. Plaintiff's reliance on X's promises and assurances was reasonable and foreseeable.

69. Plaintiff was injured by his reliance on X's promises and assurances by continuing to build a community on X and using the platform as a medium to develop and expand his cryptocurrency and NFT business, a significant source of income. Plaintiff's reliance on X induced him to use the X platform as opposed to other available platforms.

70. As a direct and proximate result of X's promises and assurances and Plaintiff's reasonable reliance as described herein, Plaintiff has been damaged in an amount to conform to proof at trial.

71. WHEREFORE, Plaintiff prays for judgment as set forth below.

## THIRD CAUSE OF ACTION

### Unjust Enrichment

72. Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

73. X claims that Plaintiff's accounts were suspended because he "broke the X Rules".

74. According to X, for at least a certain period of time, Plaintiff used X in violation of the company's policies, and X profited in the process.

75. Any profits traceable to Plaintiff's cryptocurrency and NFT business, cryptocurrency expertise, and artwork are a benefit conferred on X that it should not have received.

76. X has been unjustly enriched and, therefore, it would be inequitable for X to be allowed to retain the benefits of Plaintiff's content and business activity without being ordered to pay the reasonable value therefor, together with interest thereon at the legal rate.

77. As a direct and proximate result of the benefit conferred on X and X's subsequent unjust enrichment, Plaintiff has been damaged in an amount to conform to proof at trial.

78. WHEREFORE, Plaintiff prays for judgment as set forth below.

## FOURTH CAUSE OF ACTION

### Intentional Interference with Plaintiff's Contractual Relations with Third Parties

79. Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

80. X knew that Plaintiff, as an NFT artist and creator, used the X platform for the purpose of building a community, generating traffic, and developing his cryptocurrency and NFT

business based on organic content and high-profile celebrities and individuals following his accounts.

81. X knew that suspension of Plaintiff's accounts would be devastating to his business and his cryptocurrency and NFT work, including his ongoing and developing projects which he had thousands of individuals on a wait list and estimated millions of dollars in projected revenue.

82. X caused a disruption in Plaintiff's business, income, and ongoing and developing projects, which has negatively and severely damaged Plaintiff's business, earning potential, and livelihood.

83. X, acting with willful malice and disregard for Plaintiff's contributions to the X platform and his livelihood, interfered with Plaintiff's contractual relationships with third parties helping him build his business, third parties that have joined waiting lists for his artwork, and any third parties that have or would have entered into contractual relationships with Plaintiff for his ongoing and developing projects.

84. By reason of the foregoing, Plaintiff has incurred and will continue to incur actual damages in an amount to be determined at trial. Because Defendants acted with oppression and malice, Plaintiff is also entitled to exemplary damages.

85. WHEREFORE, Plaintiff prays for judgment as set forth below.

## FIFTH CAUSE OF ACTION

### Interference with Prospective Economic Advantage

86. Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

87. Plaintiff has used his accounts and platform on X to develop his cryptocurrency and NFT community and business, including spreading awareness and access for his past, developing, and ongoing NFT projects.

88. Both Plaintiff and X knew and understood that without access to his accounts, Plaintiff would lose the visibility and standing that his projects and platform had in the cryptocurrency and NFT community. Visibility and standing that he had spent considerable time, money, and resources to build on the X platform as opposed to another platform.

89. Both Plaintiff and X understood that Plaintiff would lose his source of income and financial benefit from the suspension of his accounts.

90. Plaintiff's cryptocurrency and NFT community and business was likely to provide Plaintiff with a significant financial benefit over and above his current business operations on the X platform. Specifically, Plaintiff had a developing NFT project that he had advertised on his X accounts. He had garnered a large following and waiting list of thousands for this project.

91. X intentionally engaged in wrongful conduct that prevented or hindered Plaintiff from performing his business and project obligations, thus preventing him from obtaining the benefit of his business and project obligations.

92. X knew the extent of Plaintiff's popularity and his cryptocurrency and NFT community, lucrative nature of his NFT projects, and earning potential on the X platform through his X accounts. Plaintiff is informed, believes, and thereon alleges that X knew the devastating impact its arbitrary and meritless suspension of Plaintiff's X accounts would have on X's business.

93. X, as alleged herein, intentionally engaged in wrongful conduct that prevented or hindered Plaintiff from performing the contract and that prevented Plaintiff from obtaining the

benefit of his cryptocurrency and NFT business. Plaintiff is informed, believes, and thereon alleges that X executed a plan designed to punish and destroy Plaintiff's business.

94. X wrongfully failed to follow its own guidelines and principles regarding content moderation and suspension of accounts on its platform and revoked Plaintiff's X accounts without engaging in a proper investigation or giving Plaintiff the opportunity to respond to his suspension with evidence that he had done nothing in violation of X's Terms or company policies.

95. X intended that its wrongful conduct would result in the suspension of Plaintiff's X accounts and that such revocation would prevent Plaintiff from maintaining and further developing his cryptocurrency and NFT community and further prevent Plaintiff from pursuing and benefitting from his business. In the alternative, X either knew or should have known that such disruption was likely.

96. As a result of X's independently wrongful conduct alleged above, Plaintiff was significantly harmed financially and reputationally. Without the cryptocurrency and NFT community he had built on his X accounts, Plaintiff was prevented from engaging in his profession. Further, without his X accounts, Plaintiff could not continue to promote this upcoming NFT project and lost the likely economic benefit he would have been able to receive otherwise.

97. As a direct and proximate result of X's wrongful conduct alleged above, which was a substantial factor in the interference of Plaintiff's ability to enjoy the benefits of his cryptocurrency and NFT business, Plaintiff has suffered financial damages in an amount to be determined during the course of litigation.

98. X's wrongful conduct was intended to cause injury to Plaintiff and was carried out with malice and/or oppression with willful or callous disregard to the rights of Plaintiff, thereby entitling Plaintiff to an award of punitive damages under Section 3294 of the California Civil Code.

99. WHEREFORE, Plaintiff prays for judgment as set forth below.

## SIXTH CAUSE OF ACTION

### Promissory Fraud

100.    Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

101.    In its Terms and public statements, X repeatedly made false representations of fact to Plaintiff, including that the company had a content moderation policy under which accounts would be suspended for reasonable grounds in compliance with company policy or that a reason would be provided in the event of suspension. X also represented to Plaintiff that he would be given the opportunity to appeal his suspension according to company policy.

102.    None of X's representations to Plaintiff held merit. Every one of these promises was false at the time X made it, and X never intended to keep any of them. When it made these representations, X knew that it did not have any intention to abide by the policy set out in its Terms or that it intended to implement a systematic and reasonable content moderation policy.

103.    X made these representations in order to convince and induce Plaintiff and individuals like him to build communities and businesses on the X platform, incurring financial benefit and profit upon X.

104.     Plaintiff was unaware of X's intent to suspend accounts for any purpose whatsoever, and justifiably relied on X's representations. Had Plaintiff known that X had no intention of keeping its promises, Plaintiff would have never made X a focus of his cryptocurrency and NFT business and community.

105.     X abjectly failed to keep any of the promises outlined above. As a direct and proximate result of X's fraud, Plaintiff spent considerable time, money, and resources to build his cryptocurrency and NFT business and community on the X platform, which he would not have done so had he known that X had not and never intended to keep its promises. X's fraudulent promises proximately caused Plaintiff damages in an amount to determined during the course of litigation.

106.     X's fraudulent conduct was committed and/or authorized by one or more officers, directors, or managing agents of X, who were acting on behalf of X and within the scope of their duties.

107.     Plaintiff is informed and believes, and on that basis alleges, that X acted with oppression and malice and with intent to injure Plaintiff, that X acted with willful and knowing disregard of Plaintiff's rights in a manner that would be looked down upon and despised by reasonable people, that X intentionally engaged in this activity with the intent to harm Plaintiff. Plaintiff is entitled to punitive damages in an amount to be established during the course of litigation.

108.     WHEREFORE, Plaintiff prays for judgment as set forth below.

## SEVENTH CAUSE OF ACTION

### Conversion

109.     Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

110.     Plaintiff used the X platform to open his social media accounts and build his cryptocurrency and NFT business that were tied to his social media presence. He was able to develop a high-profile following, including several celebrities, and waitlists containing thousands of his followers that were eagerly waiting for his upcoming NFT project.

111.     Plaintiff's social media accounts and subsequent cryptocurrency and NFT business are digital assets of which he was the owner and over which he exercised dominion.

112.     X exercised an unauthorized dominion over Plaintiff's social media accounts and subsequently, cryptocurrency and NFT community and business, to the exclusion of Plaintiff's rights.

113.     X's acts have been willful, deliberate, intended to benefit X at Plaintiff's expense, and made in bad faith, and Plaintiff has been damaged thereby.

114.     At the time that X converted Plaintiff's social media accounts and cryptocurrency and NFT business, X was guilty of malice, oppression, and a willful and conscious disregard for the rights of Plaintiff in that X, without making any investigation and with reckless indifference and willful and conscious disregard for the rights of Plaintiff, did convert the social media accounts and Plaintiff's social media accounts and cryptocurrency and NFT business.

115.     Further, after Plaintiff gave X notice that they had converted his digital assets, X failed and refused, and continues to fail and refuse, to return to Plaintiff the accounts and allow him to restore his cryptocurrency following, By reason of these acts, Plaintiff has been oppressed, and seeks punitive and exemplary damages.

116.     In addition to the punitive and exemplary damages that Plaintiff seeks, Plaintiff believes in good faith that no adequate remedy exists at law for the injuries that Plaintiff has suffered, insofar as further harm will result to Plaintiff from X's wrongful acts of conversion absent injunctive relief. If this Court does not grant injunctive relief by ordering X to restore Plaintiff's access to his social media accounts and cryptocurrency and NFT community, Plaintiff will suffer irreparable injury.

117.     As a direct and proximate result of X's wrongful conduct alleged above, which resulted in the deprivation of Plaintiff's livelihood and cryptocurrency and NFT business, Plaintiff has suffered financial damages in an amount to be determined during the course of litigation.

118.     WHEREFORE, Plaintiff prays for judgment as set forth below.

## EIGHTH CAUSE OF ACTION

**False Advertising and Unfair Business Practices (Violation of California Unfair Practices Act (Cal. Bus. & Prof. Code §§17000 et seq.))**

119.     Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

120.     X made false and misleading representations concerning Plaintiff's activities in commerce and on the X platform, including without limitation the following:

   a.   That, after X's "careful review", the company determined "Plaintiff's account broke the X Rules."

   b.   That if Plaintiff thought that X "got this wrong", he could "submit an appeal."

   c.   That Plaintiff had the opportunity to submit an appeal pursuant to X's Terms.

121.     X's false and misleading representations regarding Plaintiff's account suspension are indicative of a pattern for the suspension of cryptocurrency-related accounts and arbitrary suspension of user accounts, contrary to the company's Terms and stated policies.

122.     X has falsely stated in its Terms that it has a defined company policy and procedure on the suspension of user accounts. That user accounts may be suspended for violations under certain categories and violations. This was false and misleading advertising.

123.     Additionally, X's suspension of Plaintiff's user accounts in violation of the company's own Terms, with no true explanation, and refusal to allow Plaintiff to submit an appeal was an unfair business practice in violation of the California Unfair Practices Act (Cal. Bus. & Prof. Code §§Section 17000 et seq.).

124.     The harms suffered by Plaintiff are the proximate result of X's false and misleading representations.

125.     WHEREFORE, Plaintiff prays for judgment as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief.

a.  Award of compensatory damages, including statutory damages where available to Plaintiff against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b.  Grant of injunctive relief to restore Plaintiff's access to his X user accounts and prevent X from suspending Mr. Ryan's accounts in the future without both: (1) a reasonable and justifiable explanation compliant with its Terms, policies, and company practices; and (2) an independent third-party review of any and all suspensions and the provided justifications;

c.  Award of punitive damages on the causes of action that allow for them and in an amount that will deter Defendants and others from like conduct;

d.  Award of attorneys' fees and costs, as allowed by law including, but not limited to, California Code of Civil Procedure Section 1021.5;

e.  Award of pre-judgment and post-judgment interest, as provided by law, and;

f.  Such other, further, and different relief as the Court deems proper under the circumstances.

## REQUEST FOR TRIAL BY JURY

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted, this 12th day of June 12, 2024

_____
Donna Etemadi
Attorney for Plaintiff