United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEREMY RYAN,

           Plaintiff,

    v.

X CORP.,

           Defendant.

Case No. 24-cv-03553-WHO

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 13

Section 230(c)(1) of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1), provides broad immunity for interactive computer service providers against claims that treat the providers as publishers. Plaintiff Jeremy Ryan filed the underlying complaint against defendant X Corporation ("X", formerly Twitter) because X suspended his account. He asserts claims for breach of contract, promissory estoppel and fraud, unjust enrichment, interference with third party contracts and with prospective economic advantage, conversion, and unfair business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* Most of his claims seek to hold X liable for the act of suspending Ryan's account, an act it undertook in its role as a publisher; those claims do not survive the application of section 230(c)(1) of the CDA and thus fail as a matter of law. The claims that are not barred by section 230(c)(1) are implausibly alleged as pleaded. I will GRANT the motion to dismiss with leave to amend.

**BACKGROUND**

Ryan states that he is a successful "NFT artist" who utilizes his account on X to "further develop his cryptocurrency and NFT community," and to "promote his NFT projects." Complaint ("Compl.") [Dkt. No. 1] ¶ 42. According to the Complaint, Ryan's content and work was

1    increasingly popular on the X platform, and he says he had "thousands of individuals" waiting to

2    purchase the results of an upcoming NFT project.  *Id.* ¶ 45.

3         Ryan alleges that his seven X accounts were suspended "without any proper explanation"

4    even though, according to him, he "did not violate X's Terms, policies, or rules."  *Id.* ¶¶ 46-48.

5    Ryan says that this suspension "severely damaged his cryptocurrency and NFT business, including

6    his upcoming NFT projects."  *Id.* ¶ 47.  He asserts that this loss has cost him his "predominant

7    source of income and livelihood."  *Id.* ¶ 49.  He alleges that X's suspension of his accounts broke

8    a "promise[]" that X made in its Terms.  *Id.* ¶ 54.

9         Those Terms contain a provision that X "reserves the right to remove Content that violates

10   the User Agreement including, for example, copyright or trademark violations or other intellectual

11   property misappropriation, impersonation, unlawful conduct, or harassment."  *Id.* ¶ 64.  They also

12   state that X may "suspend or terminate your account or cease providing you with all or part of the

13   Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and

14   Policies . . . . [W]e may also terminate your account . . . for any other reason or no reason at our

15   convenience." X's Request for Judicial Notice ("X RJN") [Dkt. No. 14], Ex. A at 4.[1]  The Terms

16   also contain a liability waiver stating that: "[T]he Services may change from time to time, at our

17   discretion. We may stop (permanently or temporarily) providing the Services or any features

18   within the Services to you . . . . We may also remove or refuse to distribute any Content on the

19   Services . . . [and] suspend or terminate users . . . without liability to you." *Id.*

20        Ryan alleges that these terms are contradictory.  He also contends that X broke a promise

21   made in its "Help Center, Abuse and Harassment" webpage dated March 2024, where X states that

22   its "mission is to give everyone the power to create and share ideas and information, as well as

23   express their opinions and beliefs without barriers."  *Id.* ¶ 64.  Ryan submitted "13 individual and

24

25   [1] X requests that I take judicial notice of, or in the alternative, incorporate by reference, a copy of
     the archived copy of X's Terms of Service, as amended on September 29, 2023, available at
26   https://web.archive.org/web/20230929043620/twitter.com/en/tos (last visited August 21, 2024).
     Ryan does not oppose judicial notice.  These Terms are not subject to reasonable dispute; it is
27   appropriate for me to take judicial notice of them.  *See Zhang v. Twitter Inc.*, 2023 WL 5493823,
     at *2 (N.D. Cal. Aug. 23, 2023) (taking judicial notice of versions of X's archived Terms in effect
28   when plaintiff's account was created and when it was allegedly suspended "because they are
     publicly available webpages and their contents are not subject to reasonable dispute").

United States District Court
Northern District of California

separate appeals" challenging the suspension of his accounts. *Id.* His accounts have apparently not been reinstated.

Ryan asserts eight causes of action: (1) breach of contract, (2) promissory estoppel, (3) unjust enrichment, (4) intentional interference with plaintiff's contractual relationships with third parties, (5) interference with prospective economic advantage; (6) promissory fraud; (7) conversion; (8) unfair business practices under California's UCL, Cal. Bus. & Prof. Code § 17200 *et seq*. He demands that X reinstate his accounts and pay him compensatory damages in an unstated amount. He also asks that I preclude X from suspending his account again in the future without providing both a "reasonable and justifiable explanation compliant with its Terms, policies, and company practices" and an "independent third-party review of any and all suspensions and the provided justifications." Compl. 25-26 (Prayer for Relief). X moved to dismiss all claims. *See* Motion to Dismiss ("Motion") [Dkt. No.13].

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim. A claim may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (citation and quotation marks omitted). Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *Twombly*, 550 U.S. at 555 (quotations and citation omitted).

In considering a motion to dismiss, the court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). However, "the tenet that a court must accept a complaint's allegations as

1  true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere

2  conclusory statements." *Iqbal*, 556 U.S. at 678.

3         If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no

4  request to amend the pleading was made, unless it determines that the pleading could not possibly

5  be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

6  banc) (citations and quotations omitted).  However, a court "may exercise its discretion to deny

7  leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated

8  failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing

9  party ..., [and] futility of amendment.' " *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876,

10  892–93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182

11  (1962)).

## DISCUSSION

13         The Communications Decency Act bars most of Ryan's claims.  Those that are not barred

14  are not plausibly alleged.[2]

15  **I.     THE COMMUNICATIONS DECENCY ACT BARS CLAIMS THAT HOLD X
            LIABLE FOR ITS CONDUCT AS A PUBLISHER**

17         X argues that section 230(c)(1) of the CDA immunizes it from all of Ryan's claims.  *See*

18  Motion 6-10.  "[S]ubsection (c)(1), by itself, shields from liability all publication decisions,

    whether to edit, to remove, or to post, with respect to content generated entirely by third parties."

19  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).  The immunity is broad, but it is not

20  without limit.  To invoke this affirmative defense at the pleading stage, X must show that Ryan's

21  allegations establish beyond dispute: (1) that X is a "provider . . . of an interactive computer

22  service"; (2) that the challenged content is "information provided by another information content

---

[2] X also argues that Ryan's claims are barred by the First Amendment.  *See* Mot. 10-11.  Because I am dismissing Ryan's claims that seek to hold X liable for the suspension of his account based on section 230 immunity, I do not reach the question of whether his attempts to engage this court in regulating X's editorial decisions are also barred by the First Amendment.  However, given the Supreme Court's recent holding in *Moody v. NetChoice*, 144 S.Ct. 2383 (2024), where the Court confirmed that "[w]hen [social media] platforms use their Standards and Guidelines to decide which third-party content those feeds will display . . . they are making expressive choices [meaning] they receiving First Amendment protection," the same claims that are barred by section 230 would probably fail under *Moody*.

United States District Court
Northern District of California

1  provider"; and (3) that Ryan's claims "treat" X as the "publisher or speaker" of that information.

2  *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024) (laying out the elements of the

3  *Barnes* test).   X has made this showing for some, but not all, of Ryan's claims.

4        The first and second prongs of the *Barnes* test are met for all claims.   Ryan does not

5  contest this.   X is inarguably a "provider … of an interactive computer service" under the CDA.

6  *See* 47 U.S.C. § 230(f)(3) (defining "information content provider" as including "any person or

7  entity that is responsible, in whole or in part, for the creation or development of information

8  provided through the Internet or any other interactive computer service"); *see also Dyroff v.*

9  *Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) (explaining that the

10  "prototypical" example of an "interactive computer service" is an "online messaging board");

11  *Brittain v. Twitter, Inc*., No. 19-CV-00114-YGR, 2019 WL 2423375 (N.D. Cal. June 10, 2019)

12  (Twitter is an interactive computer service).   And Ryan seeks to hold X liable for decisions it

13  made regarding "information provided by another information content provider," i.e. information

14  that *he*, rather than X, provided.   *See Barnes*, 570 F.3d at 1109 (finding that the removal of social

15  media content falls under section 230(c)(1)); *see also King v. Facebook, Inc.*, 572 F. Supp. 3d 776,

16  780-81 (N.D. Cal. 2021) (finding that claims relating to disabling of accounts fall under section

17  230(c)(1)).

18        With respect to the third prong, to determine whether a claim seeks to treat a defendant as a

19  "publisher or speaker," courts ask first whether "the duty that the plaintiff alleges the defendant

20  violated derives from the defendant's status or conduct as a 'publisher or speaker'," and second,

21  what that same duty "require[s] the defendant to do." *See Calise v. Meta Platforms, Inc.*, 103 F.4th

22  732 (9th Cir. 2024) (citing *Barnes*).

23        Here, Ryan seeks to treat X as a publisher for most of his claims because most arise from

24  X's decision to suspend his seven accounts and suspension is a traditional publishing function

25  according to the Ninth Circuit.  *See Fair Housing Council of San Fernando Valley v.*

26  *Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("*Roommates.Com*") (stating that

27  "any activity that can be boiled down to deciding whether to exclude material that third parties

28  seek to post online is perforce immune under section 230"); *see also Murphy v. Twitter, Inc.*, 60

1    Cal. App. 5th 12, 25-26 (2021) (finding that plaintiff's claims sought to hold Twitter liable for

2    suspending her accounts, but Twitter's suspending her account was "typical publisher conduct

3    protected by section 230").  It follows that section 230(c)(1) of the CDA precludes as a matter of

4    law any claims that seek to hold X liable for its decision to suspend Ryan's accounts insofar as X

5    made that decision in the course of its duties as a publisher.

6           The Ninth Circuit has recently clarified that if a theory of liability arises from the

7    defendant's duty as something *other* than a publisher or speaker, then section 230 immunity does

8    not apply.  For example, if the defendant's duty springs from a contract, the plaintiff is not seeking

9    to hold the defendant liable as a publisher or speaker, and the defendant cannot invoke its

10   immunity.  *See Calise*, at 740 (citing *Barnes*, at 1107).  Ryan seizes on this language from *Barnes*

11   to argue that he is not seeking to hold X liable as a publisher or speaker, but rather as a

12   counterparty to a contract, the contract being X's Terms and Conditions.  But, as stated above, the

13   Ninth Circuit has also held that any activity that "can be boiled down to deciding whether to

14   exclude material that third parties seek to post online is perforce immune under section 230."

15   *Roommates.Com*, 521 F.3d at 1162-63, 1170-71; *see also Barnes*, at 1107 (quoting

16   *Roommates.Com*).  Here, the activity that most of Ryan's claims challenge boils down to X's

17   decision to exclude Ryan's material from its platform.  To the extent that is the case, his claims are

18   barred by section 230. [3]

19

20

21   [3] A recent decision by the Ninth Circuit, *Estate of Bride v. YOLO Tech., Inc.*, No. 23-55134 (9th.
     Cir. 2024), confirmed that its past decisions in *Barnes* and *Calise* outline the bounds of section
22   230 liability.  In *Estate of Bride*, the court found that insofar as the anonymous online chat
     application YOLO had "promised to unmask, and thereby prevent, bullying and abusive users,"
23   but failed to do so, YOLO could not assert section 230 immunity for misrepresentation claims
     brought by users who relied on its promises to their detriment, and, in some cases, their death.
24   There, YOLO had "repeatedly informed users that it would unmask and ban users who violated
     the terms of service," but it "never did so, and may have never intended to."  *Id.* at 17.  The court
25   held that "[s]ection 230 prohibits holding companies responsible for moderating or failing to
     moderate content", but it "does not immunize them from breaking their promises."  *Id.* at 23.  In
26   short, companies are immune from claims that arise from any duty that is "derive[d] from the
     defendant's status or conduct as a 'publisher or speaker'" but not from claims that arise from
27   promises that are not so derived.  *Id.* at 16.  The court explicitly stated that its decision "does not
     expand liability for internet companies or make all violations of their own terms of service
28   actionable claims," but only applied section 230 liability as it "already existed under *Barnes* and
     *Calise*." *Id.* at 23.

United States District Court
Northern District of California

### A. Breach of Contract

Ryan's breach of contract claim fails as a matter of law because it is barred by section 230(c)(1). Ryan contends that he "does not seek to hold X Corp. liable as a publisher . . . rather [he] seeks to hold [it] liable as a counterparty [to a contract]." Opposition to Motion to Dismiss ("Oppo.") [Dkt. No. 26] 13:1-6. He alleges that X's Terms and stated policies and procedures constitute a binding contract between the parties. Compl. ¶ 51. He claims that X "breached its contract with Plaintiff by permanently suspending his account on the basis that he violated the company's Terms with no further explanation on the nature of this violation." *Id.* ¶ 57.[4] But despite Ryan's protestations to the contrary, his suspension was undertaken by X in its capacity as a publisher of information, it meets the other *Barnes* criteria, and is protected. His attempts to draw my attention away from X's duties as a publisher and characterize it merely as a "counterparty" to a contract come up short.

The Ninth Circuit, in an en banc opinion, interpreted section 230(c)(1) of the CDA "to immunize the removal of user-generated content," such that "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates.Com*, 521 F.3d at 1162-63, 1170-71 (en banc) (quoting 47 U.S.C. § 230(c)) (footnotes omitted). X's decision to delete or block access to Ryan's individual profiles falls squarely within this immunity. *See Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th Cir. 2011) (favorably citing *Roommates.Com* and affirming district court's decision to dismiss plaintiff's claims that arose from MySpace's decision to delete her profile because those claims were precluded by section 230(c)(1)).

Ryan responds that section 230 does not provide blanket immunity to service providers

---

[4] In his opposition papers, Ryan argues that his claims do not treat X as a publisher because he says, for the first time, that X's "artificial intelligence system" suspended one of his accounts in December 2023 "by mistake", that an "automated bot" "specific[ally] represent[ed]" to him that his account would be restored, it was restored, and then was later suspended once again. *See* Oppo. 8, 10, 13. As a preliminary matter, none of these allegations appear in the complaint, which X points out and counsel for plaintiff acknowledged at oral argument. *See* Reply ISO Motion to Dismiss ("Reply") [Dkt. No. 27] 2:17-3:12. As such, I cannot consider them in evaluating Ryan's claims. Even if I did, it is unclear to me how Ryan's allegations that an automated system was responsible for at one point suspending (and then restoring) one of his seven accounts would change my analysis of X's role as a publisher in deciding to suspend his account.

against breach of contract claims.  *See* Oppo. 12:13-22 (citing *Barnes*, 570 F.3d 1096).  No doubt, each case requires the court to consider the plaintiff's claims and determine whether they arise from the defendant's actions as a publisher.  That is what the court in *Barnes* considered, and that is what I consider in Ryan's case.  In *Barnes*, as here, some but not all the plaintiff's claims were barred by section 230.  There, the Ninth Circuit considered whether an internet service provider was liable for its failure to remove material that was harmful to the plaintiff, Barnes.  *See Barnes*, 570 F.3d at 1097-99.  Barnes' ex-boyfriend had posted sexually suggestive photos of her soliciting sex on Yahoo's website without her permission.  *See id.*  The day before a local newspaper was going to run a story about this incident, Yahoo's director of communications called Barnes and told her that Yahoo would "take care of" the unauthorized photos; Barnes relied on that promise, but Yahoo did not take down the content.  *See id.* at 1099.  Barnes filed a complaint against Yahoo for (1) negligent undertaking, and (2) promissory estoppel.

The Ninth Circuit considered both claims in turn.  With respect to her claim for negligent undertaking, the court understood the duty that Yahoo had allegedly violated to be its responsibility to exercise due care in deciding whether to remove content from its website.  *See id.* at 1103.  The court, referencing its prior decision in *Roommates.Com*, explained that because that duty could "be boiled down to deciding whether to exclude material that third parties seek to post online," section 230 prohibited the plaintiff's negligent undertaking claim.  *See id.*  Here, as in *Barnes*, the duty Ryan argues X breached can be similarly distilled; the duty to maintain or suspend users' accounts arises from its Terms and its status as a publisher.[5]

State courts are in accord.  In *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12 (2021), Murphy sued Twitter for breach of contract, promissory estoppel, and consumer fraud when Twitter suspended her account after the social media company labeled some of her posts as containing hate speech.  On appeal, the court affirmed dismissal of Murphy's claims with prejudice because

---

[5] Notably, the court in *Barnes* ruled differently as to plaintiff's claim for promissory estoppel.  I will address the plausibility of Ryan's promissory estoppel claim later, in Section B.  It is not necessarily barred by section 230; it appears to arise from what Ryan alleges was a separate promise X made, and that he relied upon to his detriment.  That claim is not yet plausibly alleged but may be amended.

United States District Court
Northern District of California

United States District Court
Northern District of California

they were barred by section 230 immunity.  The court discredited Murphy's argument that because her breach of contract claim sought to treat Twitter as a "promisor or party to a contract," rather than a publisher of information provided by others, Twitter was not entitled to section 230 immunity.  Murphy, like Ryan, relied on *Barnes* to argue that "[c]ourts have routinely held that section 230 permits contract, promissory estoppel, and consumer fraud claims" like hers.  *Murphy*, 60 Cal. App. 5th at 26-27.  But the court in *Murphy* explained that *Barnes* instructs courts to focus on "whether the plaintiff's claim requires the court to treat the defendant as the publisher or speaker of information created by another," rather than on "the name of the cause of action."  *Id.* at 27.  It then noted that courts have "routinely rejected a wide variety of civil claims . . . that seek to hold interactive computer services liable for removing or blocking content or suspending or deleting accounts . . . on the grounds they are barred by the CDA." *Id.*[6]  That was the situation in *Murphy*, and it is the situation here.

Also consider the Hon. Vince Chhabria's decision in *Zimmerman v. Facebook, Inc.*, No. 19-CV-04591-VC, 2020 WL 5877863 (N.D. Cal. Oct. 2, 2020).  There, Judge Chhabria held that "[c]laims relating to the defendants' decision to block access to [the plaintiff's] Facebook profiles are barred by the [CDA]." *Zimmerman*, 2020 WL 5877863 at *1.  Judge Chhabria relied on the Ninth Circuit's decision in *Roommates.Com* to hold that "[a] social media site's decision to delete or block access to a user's individual profile falls squarely within [section 230] immunity." *Id.* Numerous other courts in this district have applied section 230(c)(1) at the pleading stage to dismiss claims like those Ryan asserts here.  *See e.g.*, *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1064-66 (N.D. Cal. 2016) (dismissing breach of contract claim and UCL unfair practices claim); *Lancaster v. Alphabet Inc.*, No. 15-cv-05299-HSG, 2016 WL 3648608, at *5 (N.D. Cal.

---

[6] *See e.g.*, *Ebeid v. Facebook, Inc.* 2019 WL 2059662, at *3–*5 (N.D. Cal. May 9, 2019) (removal of plaintiff's Facebook posts and restrictions on his use of his account constituted "publisher activity" protected by section 230); *Mezey v. Twitter, Inc.*, 2018 WL 5306769, at *1–*2 (S.D. Fla. Jul. 19, 2018) (lawsuit alleging Twitter "unlawfully suspended [plaintiff's] Twitter account" dismissed on grounds of section 230(c)(1) immunity); *Riggs v. MySpace, Inc.*, 444 Fed. Appx. 986, 987 (9th Cir. 2011) (district court properly dismissed claims arising from service provider's decisions to delete plaintiff's user profiles).

9

United States District Court
Northern District of California

1    July 8, 2016) (dismissing claim for breach of covenant of good faith and fair dealing).[7]

2          Not all breach of contract claims against social media platforms are barred by section

3    230(c)(1).  *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024), like *Barnes*, illustrates

4    another instance where the immunity did not apply because of the nature of the claim.  In *Calise*,

5    the Ninth Circuit found that a breach of contract claim alleging that Meta failed to fulfill its

6    promise to act against scam advertisements was not barred by section 230.  But that was because

7    the breach of contract cause of action in *Calise* asserted that plaintiff had relied on an "enforceable

8    promise" Meta allegedly made to prevent fraudulent advertising on its platform.  That promise, the

9    Ninth Circuit held, was distinguishable from its performance; as such, the breach of contract claim

10   arising from Meta's failure to fulfill it sought to hold Meta liable for behavior that was *not*

11   identical to publishing behavior.  Accordingly, the court found that Meta's potential liability in

12   *Calise* would come "not from [its] publishing conduct, but from [its] manifest intention to be

13   legally obligated to do something."  *Calise*, 103 F.4th at 743 (quoting *Barnes*, 570 F.3d at 1107).

14   The court explained that "[t]o the extent that Meta manifested its intent to be legally obligated to

15   'take appropriate action' to prevent scam advertisements," it became bound by a contractual duty

16   *separate* from its role as a publisher.  *Id.*[8]

17         Ryan's breach of contract claim is not analogous to the breach claims in *Calise* or *Barnes*.

18   Ryan is trying to impose liability upon X arising from its actions as a publisher, not its failure to

19   fulfill some promise separate from that role.  Ryan insists that his breach of contract claim seeks to

20   hold X accountable to a separate, enforceable promise it made to users via its "X Help Center"

21   page.  *See* Compl. ¶¶ 55, 65; Oppo 12-13.  But his argument comes up short because, as California

---

[7] As the Hon. Charles Breyer observed in a similar case to this one—brought against Twitter and its former CEO—breach of contract claims insofar as they are based on a social media company's Terms of Service fare no better than other claims under section 230.  *See Rangel v. Dorsey*, No. 21-CV-08062-CRB, 2022 WL 2820107 (N.D. Cal. July 19, 2022).  Here, as was the case in *Rangel*, X's Terms are discretionary, and merely "'incorporate[s] . . . [X's] right to act as a publisher.'"  *See Rangel*, at *3 (quoting *King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 795 (N.D. Cal. 2021)).

[8] The same was true in *Barnes* and *Estate of Bride*, cases where defendants made promises to plaintiffs that were separate from their roles as publishers and where the Ninth Circuit found that such promises took defendants outside of the ambit of section 230 immunity for some of plaintiffs' claims.

United States District Court
Northern District of California

courts have repeatedly held, statements made in a social media site's terms and community standards do not amount to a legally enforceable promise. *See e.g.*, *Murphy*, 60 Cal. App. 5th at 31; *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 196 (2017) (section 230 immunity applied even where plaintiff tried to assert breach of contract claim based on "Facebook['s] fail[ure] to adhere" to what plaintiff described as a "legally enforceable promise" found in Facebook's terms and community standards). And even if the community standards were an enforceable promise, they still outline X's duties as a publisher, nothing more.

At oral argument, counsel for plaintiff compared Ryan's case to that of the plaintiff in *Berenson v. Twitter, Inc*., No. C 21-09818 WHA, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022). There, the Hon. William Alsup declined to dismiss a breach of contract claim against Twitter that arose from Twitter's alleged violation of "direct assurances" its vice president was said to have made to plaintiff regarding the compliance of plaintiff's Twitter posts with the platform's Covid-19 misinformation policy. *See Berenson*, 2022 WL 1289049, at *2. For the breach of contract claim, Judge Alsup found that plaintiff did not " 'seek to hold [Twitter] liable as a publisher or speaker of third-party content, but rather as the counter-party to a contract, as a promisor who has breached.'" *Id.* (internal quotations omitted). In other words, the duty plaintiff claimed Twitter had breached in *Berenson* arose from something other than Twitter's status as a publisher. Again, our case is different. Ryan does not allege that X—either through its Terms or representations by its officers—made any direct promises to him about his accounts or their compliance with X's Terms. *See generally* Compl., Oppo.

Ryan's breach of contract claim, as pleaded, falls squarely within section 230 immunity. It is based on X's suspension of his accounts without explanation beyond that he "violated the Company's Terms." *See* Compl. ¶ 57.[9] Ryan has alleged no promise that is separate from X's role

---

[9] The same Terms expressly state that X reserves the right to (a) "stop . . . providing the Services" to Ryan; (b) "suspend or terminate users . . . without liability [to the user]"; (c) "suspend or terminate [user's] account . . . at any time if [X] reasonably believe[s]" that the user "violated these Terms or [X's] Rules and Policies,"; and (d) "terminate [user's] account[s] . . . for any other reason or no reason." *See* X's RJN, Ex. A at 3-4 (emphasis added). California courts have dismissed breach of contract claims where terms and conditions give the social media company defendant the right to suspend accounts for any reason or no reason. *See e.g. Murphy*, 60 Cal. App. 5th at 35-36 (dismissing breach of contract claims based on account suspension as barred by

as a publisher against which he seeks to hold X accountable.  There is only the company's decision to suspend his account, which courts have time and time again found to be a publishing decision covered by section 230 immunity.

The motion to dismiss Claim 1 is GRANTED.

## B.    Intentional Interference

Section 230(c)(1) likewise bars Ryan's claims for intentional interference with plaintiff's contractual relationships with third parties (Claim 4) and interference with prospective economic advantage (Claim 5).  *See* Compl. ¶¶ 79-99.

A claim for intentional interference with plaintiff's contractual relationships with third parties requires: (1) a valid contract or an economic relationship between the plaintiff and some third party; (2) defendant's knowledge of this relationship; (3) defendant's intentional acts designed to induce a breach or disruption of the relationship; (4) actual breach or disruption of the relationship; and (5) resulting damage.  *See Intango, LTD v. Mozilla Corp*., No. 20-CV-02688-NC, 2020 WL 12584274, at *5 (N.D. Cal. Aug. 25, 2020) (citing *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)).  In Claim 4, Ryan alleges that X "knew that [he], as an NFT artist and creator, used the X platform for the purpose of building a community, generating traffic, and developing his cryptocurrency and NFT business based on organic content and high-profile celebrities and individuals following his accounts."  Compl. ¶ 80.  He says that X "acted with willful malice" when it decided to suspend his accounts, knowing that suspension would be "devastating to his business."  *Id.* ¶¶ 81, 83.

To prove intentional interference with prospective economic advantage, a plaintiff must prove the following elements: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29

section 230, and also because defendant Twitter's terms of service expressly state that it reserve the right to "'suspend or terminate [users'] accounts . . . for any or no reason' without liability").

United States District Court
Northern District of California

Cal. 4th 1134, 1153 (2003).  In Claim 5, Ryan alleges that X "knew . . . that without access to his accounts, [Ryan] would lose the visibility and standing that his projects and platform had in the cryptocurrency and NFT community . . . [and that] [he] would lose his source of income and financial benefit." Compl. ¶¶ 88-89.  He says that X "intentionally engaged in wrongful conduct that prevented or hindered [Ryan] from performing his business . . . thus preventing him from obtaining the benefit of his business." *Id.* ¶ 91.

The nature of an interference claim is such that both Claim 4 and Claim 5 require X to engage in or refrain from certain conduct.  That conduct is the "deci[sion] to suspend [Ryan's] accounts," which X undertook in its role as a publisher of Ryan's content.  *See* Compl. ¶¶ 81-83 (alleging that X "knew that suspension of [Ryan's] accounts would be devastating to his business," and that it "interfered with [Ryan's] contractual relationships with third parties"); *see also* Compl. ¶¶ 91-93 (alleging that X "knew the devastating impact its . . . suspension of [Ryan's] X accounts would have [on his business prospects]"); *see supra* Section I(A) (explaining that social media companies act as publishers when they suspend users' accounts).  Because the conduct that Ryan alleges constitutes intentional interference with his third-party contracts and with his prospective economic advantage was undertaken by X as part of its role as a publisher, X is immune from those claims. *See Barnes*, at 1099; *Calise*, at 743; *Estate of Bride*, at 15.

The motion to dismiss Claim 4 and Claim 5 is GRANTED.[10]

**C.    Conversion**

Under California law, "[t]he elements of a conversion claim are (1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Mindys*

---

[10] Ryan's interference claims are also implausibly alleged.  With respect to Claim 4, he has not identified in his pleadings any valid contract between himself and a third party that X knew about and intentionally interfered with, much less any actual damages arising from that interference, both of which are required to state a claim for intentional interference with a third-party contract. *See generally* Compl.  With respect to Claim 5, he has failed to allege a specific contract with a third party or anything more than "general conclusory allegations" regarding lost future profits because of X's purported interference.  *See Vascular Imaging Pros., Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1013 (S.D. Cal. 2019) ("general conclusory allegations" regarding lost sales and damage to relationships between seller and customer are insufficient to state a claim for interference with a prospective economic advantage).

*Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010). Ryan alleges that he was the owner of his X accounts and the NFT and cryptocurrency businesses he ran on those accounts. Compl. ¶ 111. He says that X "exercised an unauthorized dominion" over those accounts "to the exclusion of [his] rights," and then refused to return access to his accounts. *Id.* ¶¶ 112-115.

Ryan alleges for the first time in his opposition papers that X's "artificial intelligence system" accidentally suspended one of his accounts for seven days sometime in December 2023, and that X's "automated bot" represented to Ryan that it would be restored. *See* Oppo. 8, 22. It apparently was briefly restored before being suspended again. He alleges that "[X's] artificial intelligence system's suspension of [his] account was a conversion of his digital property rights to his social media account because the artificial intelligence system, while deployed by X Corp., acted independently and of its own volition to randomly and without cause select Plaintiff's account for suspension interfering with the right of Plaintiff to use the social media accounts and by extension, depriving him of his access to his intellectual property, his monetizable content, and his ability to promote his upcoming NFT project." Oppo. 22-23.[11]

Because these allegations are asserted for the first time in response to X's motion, I cannot consider them in evaluating the plausibility of Ryan's allegations. But even if I could consider them, they would not deprive X of section 230 immunity against Ryan's conversion claims. The only "wrongful disposition" of which Ryan accuses X arises from X's suspension of his accounts and his subsequent loss of followers. Whether that was done via an artificial intelligence program or not, the action, as discussed, can be "boiled down to deciding whether to exclude material that [Ryan] [sought] to post online." *See Barnes*, 570 F.3d at 1099. That choice, and the act of

---

[11] Ryan cites a district court case from Kentucky in support of his claim, but it is not instructive because it addresses a different question. In *Int'l Bhd. Of Teamster Local 651 v. Philbeck*, 464 F. Supp. 3d 863, 867-68 (E.D. Ky. 2020), a local union sued its former president, alleging, among other things, that the president had converted the union's property after he refused to turn over passwords to social media accounts allegedly belonging to the union following an election loss. *Philbeck* does not address section 230 immunity; it merely stands for the principle that entities can have ownership interests in social media pages. *See Philbeck*, 464 F. Supp. 3d at 872-73. No one disputes that principle here.

1    suspension, falls within X's duties as a publisher.[12]

2           The motion to dismiss Claim 7 is GRANTED.

3      **D.      UCL**

4           Insofar as Ryan alleges that X's suspension of his accounts "in violation of the company's

5    own Terms, with no true explanation, and refusal to allow [him] to appeal", *see* Compl. ¶ 123, was

6    an unfair business practice in violation of Cal. Bus. & Prof. Code § 17402, X is entitled to section

7    230 immunity from that claim for the same reasons articulated above: Account suspension falls

8    within the category of actions taken as a publisher.  *See Barnes*, at 1101-02.[13]  The motion to

9    dismiss Claim 8 on this ground is GRANTED.

10   **II.    THE REMAINING CLAIMS ARE NOT PLAUSIBLY ALLEGED**

11     **A.      Unjust Enrichment**

12          An unjust enrichment claim is "grounded in equitable principles of restitution," rather than

13   "breach of a legal duty." *Calise*, 103 F.4th at 743 (citing *Hirsch v. Bank of Am.*, 107 Cal. App. 4th

14   708 (2003)).  The Complaint is sparse with respect to Ryan's unjust enrichment request; he simply

15   alleges that "[a]ny profits traceable to [his] cryptocurrency and NFT business . . . are a benefit

16   conferred on X that it should not have received." Compl. ¶ 75.  He adds in his Opposition that X

17   utilizes third-party advertising for revenue, which involves targeted advertisement placement.  He

18   argues that because suspended accounts "are not permanently removed from the X Corp. platform

19   . . . users on the X Corp. platform are still able to see [Ryan's] content alongside any advertising

20   that appears on a user's feed."  Oppo. 17:1-17.

21          Ryan's argument on this point is unclear, but I take him to mean this: when X suspends an

22   _____

23   [12] Ryan's theory of conversion ignores that X's Terms give it the right to suspend his accounts for
     "any" or "no" reason.  He has also not pleaded damages, which are required to state a claim for
24   conversion.  His argument that the "fraudulent inducement" exception exempts him from this
     requirement comes up short.  *See* Oppo. 23.  His theory of fraudulent inducement depends on what
25   he says are misrepresentations in X's Terms, but the Ninth Circuit has held that the economic loss
     doctrine bars fraudulent inducement claims where the alleged misrepresentation is in the contract
26   itself.  *See Yi v. Circle K Stores, Inc.*, 258 F. Supp. 3d 1075, 1087 (C.D. Cal. 2017), *aff'd*, 747 F.
     App'x 643 (9th Cir. 2019).

27   [13] Ryan appears to assert two theories of UCL liability.  His second theory is not barred by section
28   230, but it is implausibly alleged.  *See infra* Section II(C).

United States District Court
Northern District of California

account, posts from that account may still appear on other X users' feeds (albeit behind a "suspended account" message), and targeted advertisements *associated* with the content in those blocked posts may still appear on users' feeds, meaning that X retains revenue from the targeted advertisements associated with Ryan's content even though users can no longer interact with Ryan's content.  He says that this is unjust.  Ryan seeks the return of the profits X has obtained through the alleged retention of advertisement revenue derived from the targeted ads associated with Ryan's blocked content.

It is in no way clear from the pleadings that X has wrongfully obtained those profits.  Ryan admits that he was subject to a binding contract with X, *see* Oppo. 16-17, which would seemingly undermine his unjust enrichment claim.  He also only speculates about the profit that X has supposedly retained.  Other courts have held that "suspected windfalls" like the type that Ryan alleges here are not sufficient to maintain unjust enrichment claims.  *See e.g.*, *Watkinson v. MortgageIT, Inc.*, 2010 WL 2196083, at *7 (S.D. Cal. Jun. 1, 2010).

Ultimately, what Ryan alleges in the Complaint about unjust enrichment is different from what he argues in his Opposition, making it difficult to assess the source of his claim and its plausibility.  While this claim may ultimately be subject to section 230 immunity, or fail for a paucity of damages, Ryan should clarify what he is alleging so that I may evaluate his claim.  The motion to dismiss Claim 2 is GRANTED with leave to amend.

**B.      Promissory Estoppel and Promissory Fraud**

A claim for promissory estoppel requires (1) a promise clear and unambiguous in its terms, (2) reliance by the party to whom the promise is made, (3) the reliance must be reasonable and foreseeable, and (4) the party asserting the estoppel must be injured by his or her reliance, meaning he or she alleges legally cognizable, economic damages. *See Murphy*, 60 Cal. App. 5th at 38 (laying out the elements for promissory estoppel).  The elements of promissory fraud are the same, except that to plead promissory fraud, a plaintiff must also plausibly allege that a false promise was made and that the promisor *knew* of the falsity when making the promise.  *See Riggs*, 444 Fed. Appx. 986 at 988 (finding that the district court properly dismissed plaintiff's "promissory fraud breach of contract claim" arising from MySpace's alleged breach of its Terms

United States District Court
Northern District of California

United States District Court
Northern District of California

1   of Use because plaintiff failed to allege any legally cognizable damages).

2        Plaintiff's claims for promissory estoppel and fraud are not barred by section 230(c)(1).  In

3   his promissory estoppel claim, Ryan says he does not seek to hold X liable as a publisher or

4   speaker of third-party content, but rather as the counterparty to a contract, or, in other words, as a

5   promisor who has breached.  He seems to argue that X's representations to him about what might

6   lead to account suspension were misleading and he reasonably relied on those misleading

7   representations to his detriment.  Promising to do a thing is not the same as performing the action

8   that is promised.  Immunity that shields X from claims challenging actions it took in its role as a

9   publisher does not necessarily shield it from claims derived from promises it may have made with

10   respect to how it would treat Ryan.  *See Barnes*, at 1108-09 (promissory estoppel claims arising

11   from Yahoo's failure to follow through on a specific promise it made to plaintiff about content

12   removal not subject to section 230 immunity); *Estate of Bride*, at 23; *see also Murphy*, 60 Cal.

13   App. 5th (affirming dismissal of promissory estoppel claims that arose from Twitter's duties and

14   conduct as a publisher).

15        As X acknowledges in its motion, for purposes of section 230 immunity what matters "is

16   not the name of the cause of action, [but] whether the cause of action inherently requires the court

17   to treat the defendant as the 'publisher or speaker' of content provided."  *See* Motion 9:16-19

18   (quoting *Barnes*, at 1101-02).  This principle has been recently reaffirmed by the Ninth Circuit in

19   *Calise*, 103 F.4th at 741 (holding that where a plaintiff seeks to hold a defendant liable as a

20   promisor who has breached, rather than as a publisher of third-party content, section 230(c)(1)

21   immunity does not apply), and even more recently still in *Estate of Bride*, at 23 (holding that, as

22   explained in *Barnes* and *Calise*, "[s]ection 230 prohibits holding companies responsible for

23   moderating or failing to moderate content", but it "does not immunize them from breaking their

24   promises.")

25        In the Complaint, Ryan alleges that X, through its policies and practices, and specifically

26   through its Terms and notifications of Ryan's suspensions, made "unambiguous personal promises

27   and assurances to [Ryan], including but not limited to the following":

            1.  X reserve[s] the right to remove Content that violates the User

28                 Agreement, including for example, "copyright or trademark

violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment." X Terms of Service, Main Page, September 29, 2023. 2.

2. "X's mission is to give everyone the power to create and share ideas and information, as well as express their opinions and beliefs without barriers. Free expression is a human right – we believe that everyone has a voice, and the right to use it." X Help Center, Abuse and Harassment, March 2024.

3. "We also believe that criticism of institutions, practices, and ideas is a fundamental part of the freedom of expression and thus, we will not take action on such critical commentary." X Help Center, Abuse and Harassment, March 2024.

4. "Your account is suspended. After careful review, we determined your account broke the X Rules. Your account is permanently in read-only mode, which means you can't post, Repost, or Like content. You won't be able to create new accounts. If you think we got this wrong, you can submit an appeal." X Suspension Notice

5. "We received your request to have your account reinstated. Please respond to this email with the reason you believe your account suspension was in error and/or the reason you are requesting an appeal." X Support Email.

6. Plaintiff received an email from X's Support Account requesting additional information on his appeal. When Plaintiff attempted to access the link and submit the form, regardless of what he entered into the form, he continued to receive the original email from the X Support Account.

7. In total, Plaintiff submitted 13 individual and separate appeals from April 2 until April 18. X did not respond to any of them, give him an explanation on why his accounts were suspended, or why they have yet to be reinstated.

8. X purportedly gave Plaintiff an opportunity to appeal on the guise that the company was willing to review the basis on which his accounts were suspended and possibly reinstate. However, such representations were a ruse.

Ryan alleges that X's "specific, personal promises to Plaintiff amplified the general promises under which X stated that it maintained a company policy on the suspension of user accounts for conduct occurring in violation of the Terms." Compl. ¶¶ 64-65.[14]  He says that he reasonably and foreseeably relied on these promises to his detriment and has sustained damages in

---

[14] Ryan asserts a different theory of promissory estoppel in his Opposition than in the Complaint. In the Opposition, he argues that "X . . . established a suspension policy for user accounts, despite its conflicting provision that it may suspend accounts for any reason," and then "X . . . gave a specific representation to Plaintiff that an artificial intelligence system was responsible for randomly selecting and suspending his account." Oppo. 16:3-14.  He then says that "[c]ollectively, these actions plausibly qualify as a clear and unambiguous promise that Plaintiff was not properly suspended from the platform." *Id.* 16:14-15.  He contends that X cannot reasonably argue that his reliance on this promise was unreasonable because the "alleged representation is consistent with the provisions of the Terms." If he wants to assert this theory, he needs to do it plausibly in the amended complaint.

United States District Court
Northern District of California

the form of lost economic interests and customers due to the loss of his X account and followers.

The Complaint does not identify anything that I can reasonably interpret as a "promise" by X to not suspend his account in the manner that it did. Those "unambiguous personal promises and assurances" alleged in the Complaint included, by Ryan's own account, statements that X "reserved the right to remove Content that violates the User Agreement." Compl. ¶ 64. And X told Ryan it suspended his accounts because one or more of those accounts "broke the X Rules." *Id.* Moreover, as discussed, X's Terms stated explicitly that it could suspend accounts for "any … or no reason." *See* RJN, Ex. A. These uncontested facts make Ryan's claims implausible and differentiate them from the claims in *Berenson*, where Twitter's vice president allegedly made direct promises to the plaintiff about the permissibility of his posts vis-à-vis Twitter's Covid-19 misinformation policy and then acted in a way that was contradictory to those promises, *see supra*, Section I(A); from *Barnes*, where the defendant Yahoo promised the plaintiff it would remove sexually explicit photos of her from its platform and never did, *see supra*, Section I(A); and from *Estate of Bride*, where the defendant YOLO promised users it would "unmask" abusers on its platform and then made no effort to do so, *see supra*, n.3.

The motion to dismiss Claims 2 and 3 is GRANTED with leave to amend.

**C.      UCL**

Ryan has a second theory of liability arising out of the UCL that is not clearly barred by section 230, but it is also not plausibly alleged. He says that X "made false and misleading representations concerning Plaintiff's activities in commerce and on the X platform," and that those purported misrepresentations "are indicative of a pattern for the suspension of cryptocurrency-related accounts and arbitrary suspension of user accounts, contrary to the company's Terms and stated policies." Compl. ¶ 121. He alleges that "X has falsely stated in its Terms that it has a defined company policy and procedure" regarding the suspension of user accounts.

**1.      Damages**

First, to assert a UCL claim, a plaintiff "needs to have suffered injury in fact and lost money or property as a result of the unfair competition." *Rubio v. Capital One Bank*, 613 F.3d

United States District Court
Northern District of California

1195, 1204 (9th Cir. 2010).  Ryan's claim fails for lack of standing because he does not allege a "loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011).  He alleges that his suspension from the X platform has "severely damaged his cryptocurrency and NFT business," but he does not allege that he suffered any actual losses.  He only says that "[as] more time passes without access to his accounts and ability to promote his upcoming NFT projects or generate momentum, he continues to lose *any prospective financial advantage or profits* he had earned and was projected to earn while active on the X platform."  Compl. ¶ 47 (emphasis added).

Ryan responds that there are "innumerable ways" for a plaintiff to show "lost money or property," including showing that he had a "present or future property interest diminished."  Oppo. 24:2-10 (citing *Kwikset*, 51 Cal. 4th at 323).  But as X points out, California courts have held that allegations of lost business opportunities and lost anticipated profits are insufficient to establish standing under the UCL.  *See e.g.*, *Rogozinski v. Reddit, Inc.*, No. 23-CV-00686-MMC, 2023 WL 4475581 (N.D. Cal. Jul. 11, 2023) (finding that plaintiff had not alleged injury in fact where his only alleged economic injury was "lost book sales" and "lost contracts" because of his ban from the social media site Reddit).

If Ryan amends his Complaint to allege loss of an existing contracts, or another concrete economic injury, he still must show that his "economic injury [came] as a result of the unfair competition."  *See Kwikset*, 51 Cal. 4th at 326 (quoting Cal. Bus. & Prof. Code §§ 17204, 17535).  Given that X's suspension of his account is not a valid basis for a UCL claim (*see* Section I(D)), Ryan would have to show that his economic losses resulted from X's alleged misrepresentations regarding his account suspension, not from the suspension itself.

### 2.    "Unfair" Standard

Ryan does not allege any unlawful or fraudulent business practices.  He argues that he alleges an *unfair* practice based on X's purported failure to "properly define or effectuate a consistent content moderation policy" and then use an "artificial intelligence system" to suspend user accounts (again, alleged for the first time in opposition).  *See* Oppo. 24-25.  But the Complaint does not plausibly allege that X engaged in unfair business practices.

20

"The UCL does not define the term 'unfair.' In fact, the proper definition of 'unfair' conduct against consumers 'is currently in flux' among California courts." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (quoting *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007)). "Before *Cel-Tech*, courts held that 'unfair' conduct occurs when that practice 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' " *Id.* (citing *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (1999)).

The California Supreme Court, in *Cel-Tech Comms., Inc. v. Los Angeles Cell. Tele. Co.*, 20 Cal. 4th 163 (1999), established a different, more concrete, definition of unfair: "[U]nfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th 163. It further required that "any finding of unfairness to competitors under section 17200 be *tethered* to some legislatively declared policy or proof of some actual or threatened impact on competition." *Davis*, 691 F.3d at 1169–70 (quoting *Cel-Tech Comms., Inc.*, 20 Cal. 4th 163) (emphasis added). The Complaint, as pleaded, does not allege facts that meet either standard. The motion to dismiss is GRANTED with leave to amend.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED. Ryan shall file an amended complaint within 20 days of the date below.

**IT IS SO ORDERED.**

Dated: September 4, 2024

William H. Orrick
Senior United States District Judge