1  Kenneth M. Trujillo-Jamison (Bar No. 280212)
   ktrujillo-jamison@willenken.com
2  Eileen Ahern (Bar No. 216822)
   eahern@willenken.com
3  Kirby Hsu (Bar No. 312535)
   khsu@willenken.com
4  WILLENKEN LLP
5  707 Wilshire Blvd., Suite 3850
   Los Angeles, California 90017
6  Telephone:  (213) 955-9240
   Facsimile:  (213) 955-9250
7
8  Attorneys for Defendant X Corp.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jeremy Ryan, a California individual, | Case No.: 3:24-cv-03553-WHO |
| Plaintiff, | Hon. William H. Orrick |
| | **DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** |
| v. | |
| X Corp., a Nevada corporation, | |
| Defendant. | Date:     December 4, 2024<br>Time:    2:00 p.m. |
| | Complaint Filed:  June 12, 2024 |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION .................................................................................................................. 1
II. ARGUMENT ........................................................................................................................ 1
   A. The Terms Bar Plaintiff's Claims ................................................................................ 1
   B. Section 230 Bars Plaintiff's Claims ............................................................................. 2
      1. X Corp. Is an Interactive Computer Service Provider ............................... 2
      2. Plaintiff's Accounts and Content Are "Information Provided by Another Information Content Provider" ................................................... 3
      3. Plaintiff's Claims Seek to Impose Liability for X Corp.'s "Publishing" Activities ............................................................................. 5
   C. The First Amendment Bars Plaintiff's Claims ............................................................ 9
   D. The FAC Fails to State a Plausible Claim ................................................................ 10
      1. Plaintiff's Promissory Estoppel Claim Should Be Dismissed .................. 10
      2. Plaintiff's Unjust Enrichment Claim Should Be Dismissed ..................... 12
      3. Plaintiff's Promissory Fraud Claim Should Be Dismissed ...................... 12
      4. Plaintiff's UCL Claim Should Be Dismissed ........................................... 14
   E. Leave to Amend Should Be Denied .......................................................................... 15
III. CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abagninin v. AMVAC Chem. Corp.*,
  545 F.3d 733 (9th Cir. 2008) ............................................................................................... 15

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ............................................................................................ 3, 8

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ................................................................................................ 4

*Berenson v. Twitter, Inc.*,
  No. 21-CV-09818, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022) ............................... 8, 11, 12

*Block Sci., Inc. v. True Diagnostics, Inc.*,
  No. 21-CV-1118, 2022 WL 485010 (S.D. Cal. Feb. 16, 2022) ................................................ 2

*Breazeale v. Victim Servs., Inc.*,
  878 F.3d 759 (9th Cir. 2017) ................................................................................................... 4

*City of Santa Barbara v. Super. Ct.*,
  41 Cal. 4th 747 (2007) ............................................................................................................ 2

*Davis v. HSBC Bank Nev., N.A.*,
  691 F.3d 1152 (9th Cir. 2012) ............................................................................................... 15

*DeLima v. Google, Inc.*,
  561 F. Supp. 3d 123 (D.N.H. 2021) ........................................................................................ 8

*E.H. v. Meta Platforms, Inc.*,
  No. 23-CV-04784, 2024 WL 557728 (N.D. Cal. Feb. 12, 2024) .......................................... 15

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ......................................................................................... 4, 5, 6

*Flowers v. Wells Fargo Bank, N.A.*,
  No. 11-CV-1315, 2011 WL 2748650 (N.D. Cal. July 13, 2011) ........................................... 13

*Forrest v. Meta Platforms, Inc.*,
  No. 22-CV-03699-PCP, 2024 WL 3024642 (N.D. Cal. June 17, 2024) ................................. 5

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) ................................................................................................... 6

*Hodsdon v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) ................................................................................................. 15

*King v. Facebook, Inc.*,
  572 F. Supp. 3d 776 (N.D. Cal. 2021) ..................................................................................... 3

*Laks v. Coast Fed. Sav. & Loan Assn.*,
  60 Cal. App. 3d 885 (1976) ................................................................................................... 12

*Little v. Freedom Mortg. Corp.*,
   No. 23-CV-05283, 2023 WL 8602761 (N.D. Cal. Dec. 12, 2023) ........................................... 1

*Mishiyev v. Alphabet, Inc.*,
   444 F. Supp. 3d 1154 (N.D. Cal. 2020) .................................................................................. 8

*Moody v. NetChoice, LLC*,
   144 S. Ct. 2383 (2024) ................................................................................................ 6, 9, 10

*Murphy v. Twitter, Inc.*,
   60 Cal. App. 5th 12 (2021) ................................................................................................. 6, 8

*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022) ............................................................................... 10

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023) .............................................................................................. 10

*Papataros v. Amazon.com, Inc.*,
   No. 17-CV-9836, 2019 WL 4011502 (D.N.J. Aug. 26, 2019) ................................................ 9

*United States v. Standard Oil Co. of Cal.*,
   332 U.S. 301 (1947) ............................................................................................................... 6

*Vitt v. Apple Comput., Inc.*,
   469 F. App'x 605 (9th Cir. 2012) ......................................................................................... 14

*Watkinson v. MortgageIT, Inc.*,
   No. 10-CV-327, 2010 WL 2196083 (S.D. Cal. June 1, 2010) ............................................. 12

*Welk v. Beam Suntory Imp. Co.*,
   124 F. Supp. 3d 1039 (S.D. Cal. 2015) ................................................................................ 14

*Zhang v. Twitter Inc.*,
   No. 23-CV-00980, 2023 WL 5493823 (N.D. Cal. Aug. 23, 2023) ....................................... 15

**Statutes**

47 U.S.C. § 230 .......................................................................................................................... 1, 2, 5

47 U.S.C. § 230(c)(1) .................................................................................................................... 3, 6

47 U.S.C. § 230(f)(3) ......................................................................................................................... 3

California Civil Code § 1668 ............................................................................................................. 2

**Rules**

Federal Rule of Civil Procedure 9(b) .............................................................................................. 13

I.  **INTRODUCTION**

Plaintiff's Opposition (Dkt. 37; "Opposition") confirms that X Corp.'s Motion to Dismiss Plaintiff's First Amended Complaint (Dkt. 32; "Motion to Dismiss") should be granted—this time, without leave to amend.

After this Court granted X Corp.'s first motion to dismiss, Plaintiff had an opportunity to plausibly re-allege four of his claims. Plaintiff did not do so. Despite some minor wordsmithing, the gravamen of Plaintiff's claims remains the same as alleged in his already-dismissed Complaint: they are all based on X Corp.'s alleged decisions to moderate his content through account suspension. His claims therefore are barred by the X Terms of Service ("Terms") to which Plaintiff agreed, by section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230 ("Section 230"), and by the First Amendment. Plaintiff also fails to plausibly allege the required elements of his re-plead claims.

The Opposition fails to demonstrate otherwise. Rather, it largely recycles his arguments from the prior motion that resulted in dismissal of his Complaint. Plaintiff's Opposition also does not identify any law or allegation in the First Amended Complaint ("FAC") showing he plausibly pleaded any of his claims. Rather, the FAC's allegations are repeated from Plaintiff's already-dismissed Complaint and his opposition to X Corp.'s first motion to dismiss—allegations which this Court has already determined did not and could not state a claim.

X Corp. respectfully requests that this Court dismiss the FAC without leave to amend.

II. **ARGUMENT**

A.  **The Terms Bar Plaintiff's Claims**

The Opposition confirms Plaintiff's claims are barred by the Terms.

Plaintiff offers no response to X Corp.'s argument that the Terms give X Corp. the contractual right to suspend his accounts without liability to him. Dkt. 32 at 9–10. Plaintiff's claims can be dismissed as barred by the Terms on this basis alone. *See id.*; *Little v. Freedom Mortg. Corp.*, No. 23-CV-05283, 2023 WL 8602761, at *1 (N.D. Cal. Dec. 12, 2023) (holding that plaintiff concedes arguments to which he fails to respond in an opposition to motion to

dismiss).

Plaintiff's sole argument about why the Terms do not bar his claims is that "the question before the Court is whether the counts are based on sufficient allegations of at least gross negligence" and that California law does not permit limitation of liability provisions to bar recovery for claims based on "gross negligence." Dkt. 37 at 18–19 (citing *City of Santa Barbara v. Super. Ct.*, 41 Cal. 4th 747, 763 (2007)). The underlying law cited by the *Santa Barbara* court is California Civil Code § 1668, which renders contractual provisions as void to the extent that they "exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law." Cal. Civ. Code § 1668. But as explained in full in the Motion to Dismiss (Dkt. 32 at 15–25), Plaintiff's FAC fails to state any of his claims, let alone any claim for intentional or grossly negligent conduct. Where, as here, such fraud or other violations of the law are not plausibly alleged, Section 1668 does not render a limitation of liability clause unenforceable. *See, e.g.*, *Block Sci., Inc. v. True Diagnostics, Inc.*, No. 21-CV-1118, 2022 WL 485010, at *9 (S.D. Cal. Feb. 16, 2022) (section 1668 "does not render the [limitation of liability] provision unenforceable," where "Plaintiff has not satisfied the heightened pleading requirements of fraud" and "has not adequately alleged that Defendants violated the law").

Plaintiff's claims are therefore barred by the Terms.

**B.     Section 230 Bars Plaintiff's Claims**

The Opposition confirms that Section 230 immunizes X Corp. from Plaintiffs' claims, because: (1) X Corp. is an "interactive computer service" provider, (2) Plaintiff's Twitter[1] accounts and content posted on Twitter is "information provided by another information content provider," not X Corp., and (3) Plaintiff's claims treat X Corp. as a "publisher" of his content. 47 U.S.C. § 230(c)(1).

*1.     X Corp. Is an Interactive Computer Service Provider*

Plaintiff concedes that, as this Court already correctly concluded in its September 9, 2024

---

[1] Twitter, the online social media platform, has been re-branded as "X." This motion continues to refer to the platform as "Twitter" throughout for ease of understanding.

1  Order granting X Corp.'s Motion to Dismiss the Complaint (Dkt. 29; "MTD Order"), X Corp. is
2  an "interactive computer service" provider. Dkt. 37 at 15 (referring to "interactive computer
3  service providers, like X Corp."); *see also* Dkt. 29 at 5 ("X is inarguably a 'provider . . . of an
4  interactive computer service'"). The first prong of the Section 230 analysis is therefore satisfied.

        2.       *Plaintiff's Accounts and Content Are "Information Provided by Another Information Content Provider"*

7        Plaintiff's argument that X Corp's artificial intelligence ("AI") systems, allegedly used to
8  suspend Plaintiff's Twitter accounts, created the "content" under the second prong of the Section
9  230 analysis (Dkt. 37 at 13–15), reflects a fundamental misunderstanding of the question at
10 issue. The second prong of the Section 230 analysis asks whether the decisions for which
11 Plaintiff seeks to hold X Corp. liable (*i.e.*, to suspend Plaintiffs' accounts) concerned content
12 "provided by another information content provider." 47 U.S.C. §§ 230(c)(1); 230(f)(3) (defining
13 an "information content provider" as "any person or entity that is responsible, in whole or in part,
14 for the creation or development of information provided through the Internet or any other
15 interactive computer service"). As this Court correctly concluded in its MTD Order, "Ryan seeks
16 to hold X liable for decisions it made regarding 'information provided by another information
17 content provider,' i.e. information that he, rather than X, provided." Dkt. 29 at 5 (citing *Barnes v.*
18 *Yahoo!, Inc.*, 570 F.3d 1096, 1109 (9th Cir. 2009) and *King v. Facebook, Inc.*, 572 F. Supp. 3d
19 776, 780-81 (N.D. Cal. 2021)). Indeed, the law is well-established that both the Twitter accounts
20 that Plaintiff created, and the content he posted on Twitter using those accounts, constitute
21 "information provided by another information content provider"—*i.e.*, Plaintiff, not X Corp. *See*
22 Dkt. 32 at 12.

23       Plaintiff contends there is a "potential factual dispute as to whether the challenged
24 activity was taken entirely by *another* information content provider"—apparently referring to X
25 Corp.'s AI. Dkt. 37 at 14 (emphasis in original). Plaintiff seems to conflate the second prong
26 (determining who created the content) with the third prong of Section 230 (determining whether
27 the action taken by the platform was protected publishing activity). In any case, Plaintiff's
28 allegations that X Corp. used AI in suspending his accounts does not make either X Corp., nor its

alleged AI systems, a *creator* of Plaintiff's Twitter accounts or his content. *See Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003), *superseded in part by statute on other grounds as stated in Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766–67 (9th Cir. 2017) ("the 'exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content' do not transform an individual into a 'content provider' within the meaning of § 230") (citation omitted).

Plaintiff also makes a related argument that a "factual issue" exists as to "whether X Corp.'s aritifical [sic] intelligence system is a neutral and passive tool or whether the tools themselves contributed to the unlawful action." Dkt. 37 at 14. Again, Plaintiff conflates the second and third prongs of the Section 230 analysis. In any case, Plaintiff does *not* allege X Corp. provided him any tool that renders X Corp. a creator of the content that led to Plaintiff's account suspensions.

The seminal Section 230 case, *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) ("*Roommates*"), confirms this conclusion. Roommates.com was a roommate-matching website sued for violating housing laws that prohibit discrimination based on race, sex, and familial status, among other things. Two site features were the subject of the suit: (1) drop-down menus that required users to pick characteristics of desired roommates from choices provided by the website (*e.g.*, "straight male," "children not present"); and (2) an "open comments" section that allowed users to state in their own words what they were looking for in a roommate. The Ninth Circuit held that: (1) Section 230 did not provide immunity from claims premised on the drop-down menus because Roommates.com *required* users to choose its pre-populated answers and thus the offending content was in part developed by Roommates.com, not just the user; but (ii) Section 230 provided immunity from claims premised on the "open comments" section because users could write whatever they wanted—*i.e.*, that section was a "neutral tool," and a platform does not become a content creator by "providing *neutral* tools," even where those tools are used "to carry out what may be unlawful or illicit" activities. *See Roommates*, 521 F.3d at 1167–69. The "neutral tool" analysis has no applicability here, where Plaintiff does not allege X Corp.'s AI

systems that allegedly suspended Plaintiff's accounts contributed to the creation of the content leading to those account suspensions.[2]

In sum, both the Twitter accounts that Plaintiff created and the content he posted on Twitter using those accounts constitute "information provided by another information content provider," and the second prong of the Section 230 analysis is thus satisfied.

### 3. Plaintiff's Claims Seek to Impose Liability for X Corp.'s "Publishing" Activities

Plaintiff asserts two reasons why his claims purportedly do not seek to impose liability for publishing activity under the third prong of the Section 230 analysis: (1) "While Section 230 can provide immunity to interactive service providers, it does not provide immunity to generative artificial intelligence models or systems *deployed* by interactive service providers." (Dkt. 37 at 13); and (2) his claims purportedly are based on some independent "promise," not on X Corp.'s suspension of his account (*id.* at 9). Both arguments fail.

<u>Content Moderation Using AI Is Protected Publishing Activity</u>. Plaintiff's argument that Section 230 does not provide X Corp. immunity for account suspensions when it uses AI systems defies both the law and common sense. Nothing in the plain language of Section 230 suggests platforms are denied its protections when they use automated tools for content moderation. *See* 47 U.S.C. § 230(c)(1). Plaintiff concedes as much by citing an unenacted, proposed Congressional bill that purportedly would "exempt application of Section 230 to generative artificial intelligence." Dkt. 37 at 15–16. Plaintiff's reference to a Congressional bill proposing modifications to Section 230 does not provide a basis for this Court to depart from the settled authority on which it relied in in the MTD Order, holding that account suspensions are protected

---

[2] *Forrest v. Meta Platforms, Inc.*, No. 22-CV-03699-PCP, 2024 WL 3024642 (N.D. Cal. June 17, 2024), cited by Plaintiff (Dkt. 37 at 15), confirms this conclusion. There, the court concluded that, at the pleading stage, Section 230 did not bar the plaintiff's claims based on third parties' "deepfake" ads portraying him because he "allege[d] not simply that Meta provided 'neutral tools' which may have been used by other parties for 'unlawful purposes,' . . . but that Meta has 'active involvement' in deciding what ads look like and who they are shown to and that its automated tools 'supercharge Meta's ability to produce and drive the Scam Ads to vulnerable viewers.'" *Forrest*, 2024 WL 3024642, at 5. In other words, the allegations there bear no resemblance to this suit.

publishing activity within the meaning of Section 230. *See* Dkt. 29 (citing *Roommates*, 521 F.3d at 1170–71 and *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 25–26 (2021)). Plaintiff's invitation to rely on a bill that has not been enacted into law as a reason to disregard existing law is improper and should be rejected. *See United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 314 (1947) ("Whatever the merits of [plaintiff's argument], its conversion into law is a proper subject for congressional action, not for any creative power of ours. Congress, not this Court or the other federal courts" makes the laws); *see also Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) ("'If the evils that the appellants have identified are deemed to outweigh the First Amendment values that drive the [Section 230], the remedy is through legislation, not through litigation.'") (citation omitted).

Furthermore, as the Supreme Court recently acknowledged, social media platforms host "billions of posts or videos," and "the platforms write algorithms to implement [their] standards—for example, to prefer content deemed particularly trustworthy or to suppress content viewed as deceptive (like videos promoting conspiracy theor[ies])" and "they also remove posts entirely that contain prohibited subjects or messages, such as pornography, hate speech, and misinformation." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2388, 2403-04 (2024). All of this, the Court explained, "'constitute[s] the exercise' of protected 'editorial control.'" *Id*. at 2388 (citation omitted).

In short, Plaintiff's argument that X Corp.'s suspension of his accounts, allegedly by using AI, falls outside the scope of traditional "publishing" activities protected by Section 230 immunity fails. Rather, as this Court previously and correctly concluded, to the extent that Plaintiff's "claims seek to hold X liable for the act of suspending Ryan's account, an act it undertook in its role as a publisher; those claims do not survive the application of section 230(c)(1) of the CDA and thus fail as a matter of law." Dkt. 29 at 1.

<u>Plaintiff's Claims Seek to Impose Liability for X Corp.'s Suspension of His Accounts, Not Any Independent Promise</u>. This Court granted leave for Plaintiff to allege facts showing that his unjust enrichment, promissory estoppel, promissory fraud, and violation of the California Unfair Competition Law ("UCL") claims were not barred by Section 230 because they are based

on something other than his account suspensions. Dkt. 29 at 15, 16, 19. As explained in full in X Corp.'s Motion to Dismiss, Plaintiff failed to do so. Dkt. 32 at 13–14.

For example, Plaintiff's Opposition claims that Plaintiff seeks to "hold X Corp. liable as a counter-party that has failed to abide by promises it has made to its users and disclosures it has failed to make that significantly impacted the ability of Plaintiff to use X Corp.'s services as promised or represented." Dkt. 37 at 9–10. This general statement—a statement for which he does not provide any citation—is not enough to plausibly allege that Plaintiff's claims are based on something other than his account suspensions, and therefore Plaintiff cannot overcome Section 230. Moreover, the FAC alleges the same generalized statements in the Terms and "X Help Center" webpage that this Court already held were insufficient to plausibly allege any "promise" on which those claims could be predicated. Dkt. 29 at 10–11, 17–19.

Plaintiff's Opposition also points to allegations about: (1) an email stating that one of Plaintiff's accounts had been "mistakenly suspended" and would be reinstated (Dkt. 37 at 9–10 (X Corp.'s purported "specific representation to Plaintiff that his account would be restored because it was mistakenly suspended by an artificial intelligence system only for it to be suspended again four months later"); and (2) X Corp.'s licensing provision, which gives X Corp. ownership of user content, including Plaintiff's, and the alleged ability to "derive and retain a benefit from Plaintiff's content even though Plaintiff's accounts have been wrongfully terminated." Dkt. 30 ¶ 75; Dkt. 37 at 16 ("Section 230 does not apply to X Corp.'s . . . continued retention of a content license and financial profiting off of Plaintiff's content"). None of these allegations plausibly establish that Plaintiff's claims concern anything but his account suspensions.

With Plaintiff's allegations about the account reinstatement email, Plaintiff admits that X Corp. *did* reinstate the allegedly wrongfully suspended account, as stated in the email, and he does not allege X Corp. promised in that email that it would not suspend Plaintiff's accounts again. In other words, these allegations do not save his claims from Section 230's bar. *See Murphy*, 60 Cal. App. 5th at 31–32 (Section 230 barred claim where plaintiff did "not identify any specific representation of fact or promise by Twitter to [her] that it would not remove her

tweets or suspend her account").

As for the licensing provision allegations, Plaintiff alleges "the licensing provision does not state that if the user's account, or contract, is terminated, then the license shall be terminated." Dkt. 30 ¶ 78. Plaintiff further alleges that under the Terms, "X . . . not only possesses the right to terminate its services to any user at any time, . . . if a user's account is, in fact, suspended for any reason, X shall retain its license to that user's content and continue to generate revenue from that user's intellectual property." *Id.* ¶ 79. In other words, even taking as true Plaintiff's speculative allegations that X Corp. is "profiting" from his content while his accounts are suspended, Plaintiff concedes the Terms gives X Corp. the right to generate revenue using Plaintiff's Twitter content. *See id.* X Corp. cannot be liable for engaging in conduct expressly authorized by the Terms. *See Mishiyev v. Alphabet, Inc.*, 444 F. Supp. 3d 1154, 1159 (N.D. Cal. 2020) (where a party is "given the right to do what [it] did by the express provisions of the contract there can be no breach").

In sum, just as this Court correctly concluded with respect to the Complaint, the FAC "does not identify anything" that could be "reasonably interpret[ed] as a 'promise' by X not to suspend [Plaintiff's] account in the manner that [X Corp.] did." Dkt. 29 at 19. And Plaintiff still identifies no specific, personal promise that would allow Plaintiff to state any claim.[3] Thus, each of Plaintiff's claims seek to impose liability for X Corp.'s suspensions of Plaintiffs' accounts (*see* Dkt. 32 at 13–14), and the third prong of Section 230 is met.

Because the other two prongs of the Section 230 analysis are also met, Section 230

---

[3] All the cases on which he purports to rely are readily distinguishable. *See* Dkt. 37 at 9 (citing *Barnes v. Yahoo!*, 570 F.3d 1096, 1108 (9th Cir. 2009) (director of communications personally and directly promised plaintiff, in a phone call, content would be removed); *Berenson v. Twitter, Inc.*, No. 21-CV-09818, 2022 WL 1289049, at *1-3 (N.D. Cal. Apr. 29, 2022) (vice president contacted plaintiff directly and promised to give warning before suspending account); *DeLima v. Google, Inc.*, 561 F. Supp. 3d 123, 137 & n.37 (D.N.H. 2021) (dismissing contract claim without prejudice when the court could not tell what contract was allegedly breached and therefore could not determine whether Section 230 applied); *Papataros v. Amazon.com, Inc.*, No. 17-CV-9836, 2019 WL 4011502, at *9 (D.N.J. Aug. 26, 2019) (Section 230 barred claims based on Amazon's publishing of warnings for products sold online, but did not bar claims "based on Amazon's role as a seller" of the products)). (As of the date of this reply, the *Papataros* decision has been stayed by the District of New Jersey. 2019 WL 4740669 (D.N.J. Sept. 3, 2019).

immunizes X Corp. from Plaintiff's claims.

### C. The First Amendment Bars Plaintiff's Claims

Plaintiff's Opposition confirms the First Amendment bars his claims. Plaintiff contends the First Amendment is not a bar because his "claims are not centered on the type of content or ideas that X Corp. prefers to exclude or include as a platform." Dkt. 37 at 16–17. This assertion is belied by Plaintiff's own allegations in the FAC. *See*, *e.g.*, Dkt. 30 ¶ 93 ("Plaintiff was not properly suspended from the X Corp. platform"); ¶ 107 (X Corp. "continues to receive advertising revenue from Plaintiff's" content despite Plaintiff being allegedly "wrongfully suspended by either an artificial intelligence system or X's confusing and conflicting Terms of Service'"); ¶ 131b (requesting "injunctive relief to restore Plaintiff's access to his X user accounts"). *All* of Plaintiff's claims are based on X Corp.'s alleged decision to suspend Plaintiff from its platform—and, explained in full in the Motion (Dkt. 32 at 15), the Supreme Court has held such content moderation decisions by social media platforms receive First Amendment protection. *See Moody*, 144 S. Ct. at 2406. Indeed, although this Court did not reach the issue in its MTD Order, this Court correctly noted, "given the Supreme Court's recent holding in *Moody v. NetChoice*, 144 S. Ct. 2383 (2024), where the Court confirmed that '[w]hen [social media] platforms use their Standards and Guidelines to decide which third-party content those feeds will display . . . they are making expressive choices [meaning] they [are] receiving First Amendment protection,' the same claims that are barred by section 230 would probably fail under *Moody*." Dkt. 29 at 4 n.2.

Plaintiff argues *Moody* does not apply because the Supreme Court did not address the "merits" of the First Amendment challenge in that case. Dkt. 37 at 17. While the Court did not reach the merits of the constitutionality of the statutes at issue, the Supreme Court explained that it was "necessary" to correct the Fifth Circuit's holding "that the content choices the major platforms make . . . are 'not speech' at all," which was a "serious misunderstanding of First Amendment precedent and principle." *Moody*, 144 S. Ct. at 2399. Indeed, the Court—in significant detail—confirmed that "[t]o the extent that social-media platforms create expressive products, they receive the First Amendment's protection," and when "those platforms make

choices about what third-party speech to display and how to display it," they "produce their own distinctive compilations of expression." *Id*. at 2393. *Moody* is simply not distinguishable and confirms that Plaintiff's claims are barred by the First Amendment.

Plaintiff's argument that this Court should ignore this Court's holding in *O'Handley v. Padilla*, 579 F. Supp. 3d 1163 (N.D. Cal. 2022), likewise should be rejected. Dkt. 37 at 17–18. This Court's holding that X Corp. "makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment"—plainly applies here. *O'Handley*, 579 F. Supp. 3d at 1186–87 (First Amendment barred claims based on X Corp.'s expressive acts, including "its ultimate removal of [plaintiff's] account"), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023).

In sum, because Plaintiff's claims seek to hold X Corp. liable for its protected editorial decision that Plaintiff's content cannot be displayed on its social media platform, Plaintiff's claims may be dismissed for the additional, independent reason that they are barred by the First Amendment.

**D.     The FAC Fails to State a Plausible Claim**

   *1.     Plaintiff's Promissory Estoppel Claim Should Be Dismissed*

Plaintiff does not dispute that his promissory estoppel claim, to the extent that it is based on X's alleged suspensions of his accounts, fails as a matter of law because (a) he alleges the Terms constitute a binding "contract" between the parties (Dkt. 30 ¶ 76), which bars the claim, and (b) his alleged injury is speculative. Dkt. 32 at 15–17; Dkt. 37 at 19–23. His promissory estoppel claim may be dismissed on these grounds alone.

As Plaintiff did in his opposition to the first Motion to Dismiss, he again argues in conclusory fashion that X Corp. made him a "clear and unambiguous promise that Plaintiff was not properly suspended." Dkt. 37 at 20. But as this Court already held in its MTD Order, none of Plaintiff's allegations—asserted first in the Complaint and repeated in the FAC—constitute any such promise made by X Corp. Dkt. 29 at 17–19. As explained in full in X Corp.'s Motion to Dismiss (Dkt. 32 at 16–17), the FAC's alleged excerpts of the Terms and "X Help Center" webpage cannot plausibly be read to constitute an unambiguous promise that X Corp. would

suspend Plaintiff's accounts only if Plaintiff violated the Terms, because neither document mentions any such limitation.[4] As the Court already observed, none of these statements can "reasonably [be] interpret[ed] as a 'promise by X to not suspend his account in the manner that it did." Dkt. 29 at 19. Plaintiff fails to plausibly allege X Corp. made any promise to Plaintiff about suspending his accounts, much less a clear and ambiguous one.[5]

As explained in Section § II.B.3, *supra*, the FAC's allegations about X Corp.'s alleged email to Plaintiff about reinstating his allegedly mistakenly suspended by account also do not plausibly allege X Corp. made any promise to him that could plausibly state a promissory estoppel claim. Plaintiff concedes X Corp. reinstated his account, as promised, after the email, and Plaintiff does not allege X Corp. made any promise not to suspend his accounts again. Dkt. 30 ¶¶ 87-100. In other words, Plaintiff still fails to plausibly allege a "clear and unambiguous" promise limiting X Corp.'s express contractual right to suspend his accounts for any or no reason.[6] *See Laks v. Coast Fed. Sav. & Loan Assn.*, 60 Cal. App. 3d 885, 891, 893 (1976) (affirming dismissal of promissory estoppel claim where the terms of the letter did not, as plaintiff had argued, promise to provide financing).

Plaintiff still fails to state a plausible claim for promissory estoppel, which should be dismissed without leave to amend.

---

[4] In any event, such an implausible reading is foreclosed by the Terms' expressly granting X Corp. the right to suspend his accounts for "any" or "no reason at [X Corp.'s] convenience." Dkt. 33-2 at 5.

[5] In an argument that Plaintiff repeats with respect to each of his claims, Plaintiff refers to a version of the X Corp. Terms of Service that are not yet in effect. His point in doing so is unclear. While Plaintiff argues that the November 15, 2024 Terms of Service "address" X Corp.'s "abject failures to make certain disclosures," *see, e.g.*, Dkt. 37 at 20, he identifies no such language in particular. Even so, a version of the terms that postdates Plaintiff's use of Twitter, and is not yet in effect, has no relevance to any of Plaintiff's claims.

[6] Again, *Berenson* is distinguishable because there, the plaintiff alleged the Terms were modified by X Corp.'s implementation of a policy requiring "five strikes" before accounts would be suspended for Covid-19 misinformation and its Vice President's personal assurances the plaintiff would be given advanced notice before suspending his account. *Berenson*, 2022 WL 1289049, at *1, 3.

      2.  *Plaintiff's Unjust Enrichment Claim Should Be Dismissed*

Plaintiff does not dispute that he alleges that the Terms constitute a "contract" between the parties (*e.g.*, Dkt 30 ¶¶ 76, 105), which bars his unjust enrichment claim. *See* Dkt. 32 at 18; Dkt. 37 at 21–23. The claim may be dismissed on this ground alone.

This Court permitted Plaintiff leave to amend to make clear that "X has wrongfully obtained . . . profits" from advertising associated with Plaintiff's content because he "only speculates about the profit that X has supposedly retained." Dkt. 29 at 16. The Opposition identifies no such non-speculative allegations because the FAC does not include any. As this Court noted, "[o]ther courts have held that 'suspected windfalls' like the type that [Plaintiff] alleges here are not sufficient to maintain unjust enrichment claims." *Id.* (citing *Watkinson v. MortgageIT, Inc.*, No. 10-CV-327, 2010 WL 2196083, at *7 (S.D. Cal. June 1, 2010)). Furthermore, as set forth in Section II.B.3.b, *supra*, Plaintiff admits the Terms grant X Corp. a license in users' content, and that license does not terminate upon account suspension. The suggestion that there could be anything "wrongful" in X Corp.'s alleged derivation of revenue associated with Plaintiff's content is belied by Plaintiff's own allegations.

Plaintiff still fails to state a plausible unjust enrichment claim, which should be dismissed without leave to amend.

      3.  *Plaintiff's Promissory Fraud Claim Should Be Dismissed*

The Opposition confirms Plaintiff's promissory fraud claim should be dismissed. Plaintiff does not dispute X Corp.'s arguments that: (a) Plaintiff fails to plausibly allege X Corp. falsely promised he could appeal his account suspensions, when he specifically alleges he "submit[ted] 13 individual and separate appeals"; (b) the FAC fails to plausibly allege he relied on representations about appealing his account suspensions in "X Suspension Notice" and "X Support" emails to create his X accounts or build his business on the X platform, because the FAC alleges X Corp. sent those emails after X Corp. suspended his accounts; (c) Plaintiff fails to plausibly allege damages resulting from his inability to submit an appeal; and (d) the economic loss rule bars his promissory fraud claim. *See* Dkt. 32 at 19–23; Dkt. 37 at 23–25. The promissory fraud claim therefore should be dismissed.

Plaintiff appears to argue—repeating verbatim his arguments on X Corp.'s first motion to dismiss, which this Court granted—that the Complaint alleges promissory fraud with particularity under Rule 9(b) because the Complaint identifies X Corp.'s "executives and agents" who allegedly made the representations underlying his claim. Dkt. 37 at 24. Putting aside that he does not identify any of these alleged people with sufficient particularity, Plaintiff does not dispute he fails to meet the particularity requirement in other respects, as the Complaint does not specifically allege when Plaintiff saw the purported representations, or when he created his Twitter accounts or built his business relying on the representations. *See* Dkt. 32 at 20–21; Dkt. 37 at 23–25. Thus, the claim should be dismissed.

The Opposition points to only one allegation in the FAC identifying a specific person who purportedly made a representation: Elon Musk's alleged statement that X "will be a 'common digital town square.'" Dkt. 37 at 24 (quoting Dkt. 30 ¶ 11). But the FAC does not plausibly allege Mr. Musk had any authority to speak for X Corp. at that time, because he allegedly made the statement *before* he acquired the company. Dkt. 30 ¶ 11; *see also Flowers v. Wells Fargo Bank, N.A.*, No. 11-CV-1315, 2011 WL 2748650, at *6 (N.D. Cal. July 13, 2011) ("For corporate defendants, a plaintiff must allege the names of the persons who made the allegedly fraudulent representations, *their authority to speak*, to whom they spoke, what they said or wrote, and when it was said or written." (internal quotation marks omitted) (emphasis added)).

In addition, Plaintiff argues the various "general representations" alleged in the FAC— which include Mr. Musk's purported statement noted above, as well as Plaintiff's newer accusation that a "bot" had "represented" one of his accounts previously "was suspended by mistake"—collectively "gave him the impression" that X Corp. would limit its right to suspend accounts. Dkt. 37 at 24. But, as discussed in Section II.D.1. *supra*, Plaintiff does not identify any actual promise made to him that X Corp. would limit its right to suspend accounts, and these alleged representations are too "generalized, vague, and unspecified" to plausibly be deemed such a promise. *Welk v. Beam Suntory Imp. Co.*, 124 F. Supp. 3d 1039, 1044 (S.D. Cal. 2015) (dismissing fraud claim); *see also Vitt v. Apple Comput., Inc.*, 469 F. App'x 605, 607 (9th Cir.

2012) ("[T]o be actionable as an affirmative misrepresentation, a statement must make a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." (internal quotation marks omitted)).

In considering these same allegations, the Court already previously held, among other things, that there was nothing to reasonably interpret as a promise. Dkt. 29 at 19. Plaintiff's promissory fraud claim again should be dismissed, this time without leave to amend.

### 4.  *Plaintiff's UCL Claim Should Be Dismissed*

Plaintiff does not dispute that he fails to plausibly allege standing under the UCL. *See* Dkt. 32 at 23–24; Dkt. 37 at 25–27. Thus, as the Court found in the MTD Order, Plaintiff still "does not allege a 'loss or deprivation of money or property sufficient to qualify as injury in fact.'" Dkt. 29 at 20. Plaintiff did not try to remedy this defect in his FAC, and his UCL claim may be dismissed on these grounds alone.

Plaintiff also does not dispute he fails to plausibly allege any unlawful or fraudulent practices underlying his UCL claim. He argues only that he has alleged an unfair practice based on X Corp.'s purported failure "to properly define or effectuate a consistent corporate policy on content licensing, usage of artificial intelligence, or rules on engagement" and use of an "artificial intelligence system" to suspend user accounts. Dkt. 37 at 26–27. These purported practices cannot be "unfair" within meaning of the UCL, however, because they would not show X "offend[s] an established public policy," nor would they constitute a "practice that is immoral, unethical, oppressive, unscrupulous or substantially injurious" (*Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018) (internal quotation marks omitted)), particularly when the Terms to which Plaintiff agreed expressly allow X Corp. to suspend accounts for "any" or "no reason."[7] Dkt. 33-2 at 5; *see also Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1170 (9th Cir. 2012) (advertisements were not "against public policy, immoral, unethical, oppressive, [or]

---

[7] *E.H. v. Meta Platforms, Inc.*, No. 23-CV-04784, 2024 WL 557728, (N.D. Cal. Feb. 12, 2024), is distinguishable because there, the court found a UCL claim based on a nondisclosure was plausibly alleged against Facebook's operator, Meta, for obtaining sensitive health information of plaintiffs who were "not Facebook users and would have no reason to review Meta's terms and conditions or other disclosures." *Id.* at *4.

1  unscrupulous" where 's application process disclosed annual fee but plaintiff "failed to read the
2  terms and conditions"). The purported practices also do not plausibly "threaten[] an incipient
3  violation of an antitrust law." *Hodsdon*, 891 F.3d at 866. Thus, Plaintiff fails to plausibly allege
4  an unfair business practice for purposes of the UCL.

5      Plaintiff's UCL claim should again be dismissed.

6      **E.**    **Leave to Amend Should Be Denied**

7      This Court should deny Plaintiff another chance to allege his futile claims. No
8  amendment can save his claims, which are barred by the Terms to which he agreed, by Section
9  230, and by the First Amendment. Plaintiff also—for the second time—failed to plausibly allege
10 the required elements of his claims. And while Plaintiff asks for a third opportunity to amend, he
11 does not even identify any new facts or theories that he might amend to include. Under these
12 circumstances, leave to amend should be denied as futile. *See Zhang v. Twitter Inc.*, No. 23-CV-
13 00980, 2023 WL 5493823, at *8 (N.D. Cal. Aug. 23, 2023) (denying leave to amend claims
14 premised on X Corp.'s suspension of plaintiff's account because amendment would be futile);
15 *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008) (affirming dismissal of
16 first amended complaint without leave to amend due to "repeated failure to cure deficiencies by
17 previous amendment").

18 **III.**    **CONCLUSION**

19     For these reasons, and those stated in the Motion, Plaintiff's FAC should be dismissed
20 without leave to amend.

21     Respectfully submitted,

22 Dated: November 12, 2024    WILLENKEN LLP

23

24     By:   */s/ Kenneth M. Trujillo-Jamison*
        Kenneth M. Trujillo-Jamison
25         Attorneys for Defendant X Corp.