UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY RYAN,<br><br>          Plaintiff,<br><br>   v.<br><br>X CORP.,<br><br>          Defendant. | Case No. 24-cv-03553-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 32 |

Defendant X Corp., (formerly Twitter, hereafter, "X") suspended several of plaintiff Jeremy Ryan's X accounts last year. Soon after that, Ryan filed this action. Four claims remain: promissory fraud, promissory estoppel, unjust enrichment, and an unfair business practices claim. As pleaded, all are barred by X's Terms of Service (the "Terms"), which limit X's liability for any conduct arising out of users' inability to access their accounts. Ryan's unjust enrichment claim would also be barred by section 230 of the Communications Decency Act of 1996 ("section 230"). I will grant X's motion to dismiss and allow one last opportunity for Ryan to amend his complaint.

## BACKGROUND

The parties are familiar with the factual background of the case. In the Order Granting Motion To Dismiss ("Order") (Dkt. No. 29), I held that Ryan's breach of contract, intentional interference, and conversion claims were barred by section 230 because they "ar[ose] from X's decision to suspend [Ryan's] seven accounts and suspension is a traditional publishing function according to the Ninth Circuit." Dkt. No. 29. I also dismissed Ryan's California Business and Professions Code § 17200 ("UCL") claim to the extent that it was also predicated on X's suspension of his accounts and because it did not allege any economic damages. *Id.*

In his First Amended Complaint ("FAC") [Dkt. No. 30], Ryan still alleges that X

wrongfully suspended his accounts and denied him the opportunity to appeal the suspensions, but he has trimmed and redirected his claims. His promissory estoppel claim asserts that X did not follow its "multi-pronged suspension policy" when it suspended his accounts. FAC, ¶¶ 91-94. He alleges that he "did not violate X's Terms, policies, or rules," but that his accounts were nevertheless suspended "without any proper explanation." *Id.* ¶¶ 46, 82. He also claims that X used an artificial intelligence system to target, identify, and suspend his account, something which it did not disclose to its users. *Id.* His unjust enrichment claim stems from the same facts; he alleges that because X suspended his accounts in the manner he describes, the revenue it generates from advertisements that still run alongside or are associated with his now-unavailable content is revenue wrongly obtained. *Id.*

Ryan's promissory fraud claim asserts that X promised (through its Terms, representations made in its "Help Center" and media commentary by Elon Musk) not to suspend accounts without cause but failed to adhere to those promises. *Id.* ¶¶ 113, 118. His UCL claim alleges that X "engaged in unfair business practices by using an artificial intelligence system to identify, target, and suspend user accounts without providing proper notice in its Terms and allowing this system to suspend accounts for any reason at all," by "represent[ing] to users and Plaintiff . . . that it abides by a multi-pronged suspension policy" despite allegedly "never publiciz[ing] the provision of its Terms stating that the company may suspend accounts for any reason," and by representing that Plaintiff could "submit an appeal" with respect to the suspension of his accounts. *See id.* ¶¶ 124, 126-27.

X has moved once again to dismiss all of Ryan's claims. Motion to Dismiss ("Motion") [Dkt. No. 32].

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim. A claim may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (citation and quotation marks omitted). Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *Twombly*, 550 U.S. at 555 (quotations and citation omitted).

In considering a motion to dismiss, the court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (citations and quotations omitted). However, a court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ..., [and] futility of amendment.' " *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**DISCUSSION**

**I.    X'S TERMS OF SERVICE BAR RYAN'S CLAIMS**

All of Ryan's claims are barred by the Terms, which provide that the platform may stop providing its services to users for any or no reason. Ryan concedes that the Terms, which are a part of X's User Agreement, are a legally binding contract to which he is a party. *See* FAC ¶¶ 76, 78, 105-06, 125. But he notes that the limitation of liability clause does not bar claims for fraud or gross negligence. While that is true, that does not help him because he has not plausibly alleged either.

3

### A.   The Terms

X's Terms of Service (the "Terms") provide, in relevant part:

> We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you . . .
>
> . . . [X] *[s]hall not be liable* for any indirect, incidental, special, consequential or punitive damages, or any loss of profits or revenues . . . *resulting from" the user's "inability to access or use the services*.

X's Request for Judicial Notice [Dkt. No. 33-2] Ex. A ("X Terms") at pp. 3-6 (emphasis added).[1]

This liability limitation applies to "any theory of liability, whether based on . . . contract, statute, tort . . . or otherwise." *Id.* California courts regularly recognize limitation of liability clauses as valid. *See e.g.*, *Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118 (2015); *Food Safety Net Services v. Eco Safe Systems USA, Inc.*, 209 Cal. App. 4th 1118 (2012).[2]

### B.   X Has Limited its Liability for Ryan's Claims

All of Ryan's claims arise from his inability to access X's services after it suspended his accounts. His promissory estoppel claim seeks damages for what he says were false promises that X made to him about how it would handle account suspension; he alleges that X made "specific, personal promises" that it would not suspend his "access" to his accounts but did anyway. FAC ¶¶ 46-51, 85-89. His unjust enrichment claim seeks recovery of advertising revenue that X purportedly obtained through its continued use of Ryan's accounts after their suspension. *See id.* ¶¶ 106-109. His promissory fraud claim seeks damages for what he describes as X's misrepresentations about its appeals process to get his accounts unsuspended. *See id.* ¶¶ 113-15, 119. And his UCL claim seeks damages for X's retention of "a financial benefit" from Ryan's accounts' suspension and his loss of prospective economic advantages. *See id.* ¶¶ 128-29; *see* Motion 8-10; X Reply [Dkt. No. 38] 1-2; Terms at p. 6.

---

[1] X has asked that I take judicial notice of its Terms. Dkt. No. 33-2. Ryan does not oppose. The contents of the Terms are not subject to reasonable dispute and the defendant's Request for Judicial Notice is GRANTED.

[2] These clauses have been specifically recognized as appropriate where one party is offering a service for free to the public, as is the situation here. *See e.g.*, *Lewis*, 244 Cal. App. 4th at 125 (citing *Marksborough California, Inc. v. Superior Court*, 227 Cal. App. 3d 705 (1991)).

4

Ryan points out that California courts find limitation of liability provisions unenforceable under California Civil Code section 1668 to the extent that those provisions insulate a party from fraud or gross negligence. *See* Opposition to X's Motion to Dismiss ("Oppo.") [Dkt. No. 37] 18-19 (citing *City of Santa Barbara v. Superior Court*, ("*Santa Barbara*") 41 Cal. 4th 747 (2007)). Only one of his four claims, for promissory fraud, alleges fraud or gross negligence. He argues that section 1668 precludes X from limiting its liability against that claim because it involves a "standard above negligence." *Id*. But even in that claim, he has failed to plausibly allege fraud.

### 1.    Section 1668

Section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud . . . or violation of law, whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668. California courts have repeatedly interpreted the statute as rendering limitation of liability unenforceable to the extent that they would insulate an individual or entity from liability for fraud or willful injury. *See e.g.*, *WeBoost Media S.R.L. v. LookSmart Ltd.*, No. C 13–5304 SC, 2014 WL 2621465, at *9–10 (N.D. Cal. June 12, 2014); *New England Country-Foods, LLC v. Vanlaw Food Products, Inc.*, 87 F.4th 1016, 1019-20 (9th Cir. 2023).

The Ninth Circuit provided a helpful overview of section 1668 law in *New England Country Foods*:

> The California Supreme Court has held that provisions exculpating all liability for "intentional wrongdoing" and "gross negligence" are invalid under Section 1668. *See Westlake Cmty. Hosp. v. Superior Ct.*, 17 Cal. 3d 465, 479, 131 Cal.Rptr. 90, 551 P.2d 410 (1976) (holding that a bylaw that "bar[red] ... plaintiff's claim based on the *intentional* wrongdoing of the hospital or its staff" was invalid under Section 1668 (emphasis in original)); *City of Santa Barbara v. Superior Ct.*, 41 Cal. 4th 747, 751, 62 Cal.Rptr.3d 527, 161 P.3d 1095 (2007) (holding "that an agreement made in the context of sports or recreational programs or services, purporting to release liability for future gross negligence, generally is unenforceable as a matter of public policy"). Accordingly, Section 1668 will "invalidate[ ] contracts that purport to exempt an individual or entity from liability for future intentional wrongs," "gross negligence," and "ordinary negligence when the public interest is involved or ... a statute expressly forbids it." *Spencer S. Busby, APLC v. BACTES Imaging Sols., LLC*, 74 Cal. App. 5th 71, 84, 289 Cal.Rptr.3d 100 (2022) (internal quotation marks omitted) (quoting *Frittelli, Inc. v. 350 N. Canon Drive, LP*, 202 Cal. App. 4th 35, 43, 135 Cal.Rptr.3d 761 (2011)).

87 F.4th at 1019-20.

In *Santa Barbara,* the court considered the effect of section 1668 on a contractual provision that sought to release the City of Santa Barbara (the "City"), from liability for future gross negligence. *See Santa Barbara*, 41 Cal. 4th 747 (2007). The mother of a developmentally disabled 14-year-old girl had signed an application form that released the City from liability for "any negligent act" related to the child's participation in the City's summer camp for developmentally disabled children. Her daughter drowned while attending the camp and the parents sued the City. The California Court of Appeal held that "(1) the agreement in the application form was effective and enforceable insofar as it concerned defendants' liability for future *ordinary negligence*, but (2) the release of liability clause for future *gross negligence* was unenforceable." *Id.* at 751 (emphasis added). On appeal, the Supreme Court of California affirmed the second conclusion.[3]

Since *Santa Barbara*, other California courts have considered the appropriate scope of liability-limiting clauses like the one at issue here and held that section 1668 renders liability waivers unenforceable to the extent that those waivers would insulate a party from fraud, intentional tort liability,[4] or gross negligence. *See e.g.*, *WeBoost Media*, 2014 WL 2621465, at *9-10. Where there are no plausible allegations of fraud, intentional tort liability, or gross negligence, the constraint is inapplicable. *See e.g.*, *Block Scientific, Inc. v. True Diagnostics, Inc.*, 2022 WL 485010, at *9 (S.D. Cal. Feb. 16, 2022) (holding that section 1668 does not render a limitation of liability provision unenforceable where the plaintiff "has not satisfied the heightened pleading requirements of fraud" and "has not adequately alleged that Defendants violated the law").

---

[3] The *Santa Barbara* court noted that no published California case as of 2007 had upheld (or voided) an agreement that purported to release liability for future gross negligence, only "ordinary" or "simple" negligence, making the issue before it one of first impression. In the absence of California authority on the issue at the time, the court turned to other jurisdictions, and found that the "vast majority of decisions . . . [held] that such agreements," i.e. those that waive future liability for gross negligence, "generally are void on the ground that public policy precludes enforcement of a release that would shelter aggravated misconduct." *See id.* at 760 (collecting non-California cases). The *Santa Barbara* court followed that analysis.

[4] Notably, Ryan did allege intentional torts in his first complaint—he alleged intentional interference with his economic advantage and conversion—but I dismissed those claims without leave to amend because they were barred by section 230. Dkt. No. 29.

### 2. Ryan Has Not Plausibly Alleged Fraud

If Ryan had plausibly alleged fraud, X's limitation of liability clause might not apply to his promissory fraud claim. He has not done so.

The elements of a promissory fraud claim are (1) "a promise clear and unambiguous in its terms" (2) that is false; (3) "that the promisor know of the falsity when making the promise;" (4) "reliance by the party to whom the promise is made" (5) that is "both reasonable and foreseeable;" and (6) resulting injury. *Aceves v. U.S. Bank, N.A.*, 192 Cal. App. 4th 218, 225, 231 (2011). Under Rule 9(b), parties must "allege fraud with particularity," including the "who, what, when, where, and how of the misconduct charged." *See Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 958 (9th Cir. 2023).

The FAC does not allege a "promise" by X to not suspend Ryan's accounts, despite Ryan's contentions in his briefs and at the hearing. *See* Oppo. 23-24. Ryan does not allege when these supposed representations were made. He simply asserts that "X's . . . executives and agents have made numerous general and specific representations that [X] will not be overly active in its suspension of user accounts." FAC ¶¶ 11, 112-115; Oppo. 23-24. He offers statements by Elon Musk that the platform will be a "'common digital town square,'" X's "Freedom of Speech, Not Reach" policy, and "repeated statements by corporate executives that the company will not bad [sic] user accounts for reasons contrary to its Terms." Oppo. 23-24; FAC ¶¶ 11, 15. These generalized allegations are far from "clear and unambiguous" promises not to suspend Ryan's accounts. And they do not come close to meeting the Rule 9(b) particularity standard.[5], [6]

---

[5] The closest that Ryan comes to alleging fraud with particularity is his allegation that on December 19, 2023, X emailed him explaining that one of his accounts associated with the handle "@nftdemon_420" had been *mistakenly* suspended, and X was "unsuspend[ing]" it, *see* FAC ¶ 47. X did "unsuspend" that account, but later suspended it again in April 2024. FAC ¶¶ 49-50. Ryan argues that this representation indicated to him that he would be allowed back on the X platform because he had not violated its Terms. But he never alleges how X represented to him that it would not suspend his accounts in the first place or that he would be allowed back on X indefinitely.

[6] Ryan also alleges that "X never represented to [Ryan] . . . that it used artificial intelligence systems to target, identify, and suspend user accounts," FAC ¶ 114, but does not allege how or why this would constitute fraud. No cited authority suggests that a social media platform using an AI system to identify accounts for suspension qualifies as a fraudulent practice.

7

Finally, Ryan's claim that he "resumed his activities . . . under the representation that his compliance with [X's] Terms of Service and adherence to the rules of the platform would allow him to continue creating content, building his business, and engaging with the cryptocurrency and NFT community" is conclusory and contradicted by X's Terms. *See* FAC ¶¶ 50-51. He provides no indication of when, how, where, or in what context X represented to him that so long as he complied with its Terms and "adhere[ed] to the rules of the platform" he could continue using his accounts indefinitely and without interruption. Any such representation would have been out-of-step with the Terms.

\*\*\*

Taking all pleaded facts as true, Ryan does not plausibly allege the kind of conduct that would render X's limitation of liability unenforceable under section 1668. The Terms anticipate and release X from liability for claims like Ryan's that seek "indirect, incidental, special, consequential or punitive damages, or any loss of profits or revenues . . . resulting from" the user's "inability to access or use the services."

## II.   SECTION 230

While Ryan's claims are all barred by the Terms, which warrants their dismissal, his unjust enrichment claim would also be barred by Section 230(c)(1) of the Communications Decency Act.[7]

To invoke section 230 as an affirmative defense at the pleading stage, X must show that Ryan's allegations establish beyond dispute that: (1) that X is a "provider . . . of an interactive computer service"; (2) that the challenged content is "information provided by *another* information content provider"; and (3) that Ryan's claims "treat" X as the "publisher or speaker" of that information. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024) (laying out the elements of the test for section 230 immunity as iterated by the Ninth Circuit in *Barnes v.*

---

[7] X argues that section 230 bars *all* of Ryan's claims, but I disagree. His claims for promissory fraud and estoppel and his UCL claim are implausibly alleged, but they seek to hold X liable for what Ryan interpreted as promises to treat his accounts in a particular way; those purported promises are distinct from X's publishing conduct.

8

*Yahoo!*, *Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), the "*Barnes* test") (emphasis added).

Previously, I could not ascertain whether Ryan's unjust enrichment claim was subject to section 230 because the pleadings were unclear. *See* Order at 15-16. I directed Ryan to amend his complaint to clarify. According to the FAC, X is wrongfully deriving and retaining a benefit from Ryan's intellectual property because it still generates advertising revenue from ads that continue to run alongside Ryan's suspended accounts even though Ryan cannot himself access his accounts or the content they hosted. FAC ¶¶ 103-111. He contends that this revenue is wrongfully gotten.[8] FAC ¶¶ 105-110.

At its heart, Ryan's unjust enrichment claim attempts to hold X liable for decisions it made as a publisher and is accordingly barred by section 230. X decided to suspend Ryan's accounts (a publishing activity) and it continues to allow various entities to advertise on its platform (also a publishing activity). This claim does not attempt to hold X liable for alleged misrepresentations or false promises. Ryan does not assert that X promised him that it would not continue to generate ad revenue from advertisements associated with his suspended accounts—he merely challenges its decision to do so. *See* FAC ¶¶ 103-111.

Ryan argues that section 230 *generally* does not apply to *any* of his claims, both because he says that his claims arise from "X's unlawful activity embedded in its inconsistent Terms . . . and conflicting statements," rather than from its publishing activity per se, and also because he believes that X's use of an AI system to suspend accounts takes it outside the scope of section 230 protection. *See* Oppo. 9-10. Neither argument holds water.

**A. The Second *Barnes* Element is Met for All Claims**

There is no dispute that the first *Barnes* element is met: X is a provider of an interactive

---

[8] Ryan alleges that since he filed his opposition to X's first motion to dismiss, X has "taken remedial steps to change this function on the X platform," Oppo. 22:16-18. At oral argument, Ryan's lawyer clarified that she was referencing new provisions in X's updated Terms that involved its use of artificial intelligence systems. *See* Dkt. No. 37-2 (Ryan's Request for Judicial Notice of X's updated Terms). I grant Ryan's request for judicial notice (there appears to be no dispute about the legitimacy of the new Terms), but they have no effect on my analysis. The provision that Ryan's counsel pointed to at oral argument merely states that X has the right to use information that its users provide to train its machine learning and artificial intelligence models without compensation to the user. *Id.* at pp. 7, 21.

1   computer service. The second *Barnes* element was also uncontested the first time around; all of
2   Ryan's claims hold X liable for decisions it made regarding "information provided by another
3   information content provider," i.e. information that *Ryan*, not X, provided. *See Barnes*, 570 F.3d at
4   1109 (finding that the removal of social media content falls under section 230(c)(1)); *see also*
5   *King v. Facebook, Inc*., 572 F. Supp. 3d 776, 780-81 (N.D. Cal. 2021) (finding that claims relating
6   to disabling of accounts fall under section 230(c)(1)); First Motion to Dismiss [Dkt. No. 13];
7   Opposition to First Motion to Dismiss [Dkt. No. 26].

But now Ryan argues that section 230 immunity "only applies if the interactive computer service provider is not also a 'information content provider'." Oppo. 10:12-19. He says that "section 230 does not immunize X . . . from its own unlawful activity and therefore does not bar [his] claims," *see id*. 10:8-12:28, and argues that because X "is responsible in whole or in part" for creating or developing content (the nature of which he does not specify), it is *also* an "information content provider" as defined by 47 U.S.C. § 230(f)(3) and is therefore not immune under section 230(c)(1).[9]

I do not fully understand this argument, but I think that Ryan may be contending that because he alleges that the "challenged activity" (i.e. X's suspending of his accounts) may have been taken "entirely by *another* information content provider," meaning X's AI system, he has shown a dispute about whether the challenged content is provided by "another" information content provider. If my interpretation is right, Ryan misunderstands X's burden in establishing a section 230 defense. He conflates the second *Barnes* element, which considers the source of the content at issue, and the third *Barnes* element, which considers whether the challenged action was undertaken in the actor's role as a publisher or speaker.

Nothing in the FAC allows me to infer that X (or anyone other than Ryan) provided the information on Ryan's pages. The FAC does allege at various points that something other than X

---

[9] That subsection defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

10

1  (its AI systems) could have made the decision to suspend Ryan's accounts.[10]  (This argument

2  makes no sense to me; if X uses its AI system, it is still X's ultimate decision that is at issue.)

3  Regardless, that has no bearing on the second *Barnes* element.  Whether X or its AI system or

4  some combination thereof made the decision to suspend Ryan's accounts, the content at issue on

5  those accounts was content provided by "another" information content provider other than X or its

6  AI system: Ryan.  The second *Barnes* element is met with respect to all claims.

### B. The Third *Barnes* Element is Met for Ryan's Unjust Enrichment Claim

Ryan offers two reasons why his claims generally do not seek to impose liability for "publishing" activity and thus do not meet the third *Barnes* element.  First, he argues that "[w]hile section 230 can provide immunity to interactive service providers, it does not provide immunity to generative artificial intelligence models or systems deployed by interactive service providers."  Oppo. 13.  Second, he argues that all four of his remaining claims are based on some kind of independent "promise" that X made to him, not on its decision to suspend his accounts, and thus are not subject to section 230.  *Id.* 9.  The first argument lacks foundation.  The second is not applicable to his unjust enrichment claim.

#### 1. X's Use of AI Systems

First, no authority suggests that X's use of a generative AI model to do content regulation deprives it of section 230 immunity.  Nothing in the plain language of the statute suggests that X would be denied section 230 protection because it uses an AI system for content moderation.  *See generally*, 47 U.S.C. § 230(c)(1).  No court has held otherwise.

Realizing this, Ryan turns to an unenacted Congressional bill that proposed modifications to section 230.  *See* Oppo. 14-15 (referencing Senator Josh Hawley's proposed "No Section 230 Immunity for AI" Act, which sought to amend the Communications Decency Act such that

---

[10] Ryan alleges that the AI system operated outside of X's control to suspend his accounts, based on its own "machine learning capabilities and ability to form independent behaviors and actions", *see* Oppo. 14:9-12.  He goes on to argue that X "has not demonstrated that there can be no dispute … that X's actions were related to content produced by another information content provider and not its own behavior or that its contributions are entirely unrelated to the aspect of the conduct [that] was allegedly unlawful." *Id.*

11

"nothing in this section . . . shall be construed to impair or limit any claim in a civil action . . . brought under Federal or State law against the provider of an interactive computer service if the conduct underlying the claim or charge involves the use or provision of generative artificial intelligence by the interactive computer service."); *see supra* n. 6. An unenacted bill has no persuasive power here. Ryan has offered no authority that suggests section 230 protections are to be rescinded from interactive computer services that use AI systems to moderate content. X's decision to suspend—and its act of suspending—Ryan's accounts was publishing activity that falls within the scope of section 230.[11]

### 2. Misleading Representations

Ryan's unjust enrichment claim fundamentally challenges X's decision to suspend his accounts, which is a publishing activity, and its continued collection of ad revenue associated with those accounts. The Ninth Circuit has held that any activity that "can be boiled down to deciding whether to exclude material that third parties seek to post online," i.e. publishing conduct, "is perforce immune under section 230." *Roommates.Com*, 521 F.3d at 1162-63, 1170-71; *see also Barnes*, at 1107 (quoting *Roommates.Com*).

As indicated *supra*, n.7, Ryan's claims for promissory fraud and estoppel and his UCL claim do challenge something other than publishing conduct, albeit unsuccessfully: They challenge X's alleged misrepresentations. But his unjust enrichment claim does not allege that X promised that it would cease all advertising activity connected to his accounts in the event that it suspended those accounts. *See* discussion *supra*, Section I(B). It alleges that X's decision to continue publishing ads connected to his accounts was wrongful, and its retention of associated revenue is unjust. This claim challenges X's publishing activity. It is barred by section 230.

---

[11] X also points out that the United States Supreme Court recently contemplated social media platforms' use of "algorithms" to implement community guidelines and standards, including to take down content that violates those guidelines and standards. *See Moody v. NetChoice*, 144 S. Ct. 2383 (2024) (considering whether a Florida statute that limited social media platforms' capacities to engage in content moderation violated the First Amendment). But the majority opinion in *Moody* did not contemplate the use of *artificial intelligence systems* to regulate content, which is what Ryan alleges X is using, so *Moody* is not helpful here. Justices Alito, Thomas, and Gorsuch, concurring, noted that social media platforms will increasingly use AI systems to arrange, delete, and modify content. But no substantive guidance came from *Moody* on this question.

**CONCLUSION**

All of Ryan's claims are barred by X's Terms. His unjust enrichment claim would also be barred by section 230. Ryan may file an amended complaint within 30 days of the date below (given the holidays). I expect that I will not agree to further amendment thereafter.

**IT IS SO ORDERED.**

Dated: December 9, 2024

William H. Orrick
United States District Judge

13