Donna Etemadi, Bar No. 354563
Etemadi Legal Group PC
137 Pineview
Irvine, CA 92620
Telephone: (323)688-0616
E-Mail: donna@elglaw.co

*Attorney for Plaintiff*
Jeremy Ryan

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY RYAN, a California individual, <br>         Plaintiff, <br>   vs. <br><br> X CORP., a Nevada corporation, <br>         Defendant | Case No.: 3:24-cv-3553 <br><br> **SECOND AMENDED COMPLAINT FOR:** <br>   1. **PROMISSORY ESTOPPEL** <br>   2. **UNJUST ENRICHMENT** <br>   3. **PROMISSORY FRAUD** <br>   4. **FALSE ADVERTISING AND UNFAIR BUSINESS PRACTICES** <br><br> **DEMAND FOR JURY TRIAL** |

### PARTIES

1. X Corp. ("X") is a Nevada corporation with a principal place of business located at 1355 Market Street, Suite 900, San Francisco, CA 94103.

2. Jeremy Ryan is a resident of the State of California.

### JURISDICTION

3. X is a citizen of Nevada and California. Jeremy Ryan is a citizen of California. X and Jeremy Ryan have completely diverse citizenship. Plaintiff is seeking damages in excess of $75,000. This Court has subject matter jurisdiction over this case under 28 U.S.C. §1332.

4. X's headquarters are in San Francisco, California. This Court has general personal jurisdiction over X under the Due Process Clause of the Fourteenth Amendment. This

Court also has jurisdiction over Twitter pursuant to California's Long-Arm Statute, Cal. Code. Civ. Proc. §410.10, which provides that "[a] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

## VENUE

5. Venue is proper in this judicial district under 28 U.S.C. §1391 because X's headquarters are in this judicial district. Further, X's Terms of Service ("Terms") provide that "[a]ll disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco, County, California, United States…"

## DIVISIONAL ASSIGNMENT

6. Pursuant to Civil L.R. 3-2(c), this case should be assigned to the San Francisco division because a substantial portion of the events giving rise to this case occurred at X's corporate headquarters located in San Francisco.

## FACTUAL BACKGROUND

*"Content moderation is like a digital chastity belt, keeping the internet from experiencing the full range of human expression… So…embrace the chaos of the internet!"*

– **Elon Musk, CEO of Defendant X, in a tweet on February 19, 2024**

7. X, formerly Twitter, is one of the world's most predominant social media platforms and mediums for content creation, including creation that generates revenue and financial profit not only for the platform but for the creator as well.

8. Despite the platform's announced commitment to "defending and respecting the user's voice" as one of its core values, it has repeatedly engaged in behavior contrary to this core

value to the detriment of Plaintiff Jeremy Ryan. *Defending and respecting the rights of people using our services,* X, https://help.twitter.com/en/rules-and-policies/defending-and-respecting-our-users-voice.

9. Amidst the noise and "chaos of the Internet" that Defendant X and Mr. Musk have generated over content moderation and free speech, Defendant X failed to remember that it was still an online service provider that was entering into a contract that creates obligations and duties for each party, and it was doing so with internal policies and practices that failed to align with its promises and contractual terms.

10. In the following months, Mr. Musk and X engaged in repeated behavior that illustrated conflicting approaches to content moderation and a general lack of a cohesive and proper policy that is memorialized in its Terms of Service, which is a contract between the parties entered into at the time of account registration. This failure to abide by its own Terms of Service, which is a contract of adhesion that every user agrees to, can and has led to financial damage suffered by its users.

11. X has repeatedly demonstrated that although its Terms contain an official policy for the suspension and appeal of accounts, corporate policy and practice contradicts that and X has failed at a bare minimum to even attempt to comply with its own Terms.

12. Plaintiff alleges that Defendant X does not have any intention of honoring its appeal policy even though it is clearly stated in the Terms at the time of registration and advertised to the public, prospective users, and current users.

13. X's misleading and fraudulent practices have led to the harm against Plaintiff Jeremy Ryan.

14. An NFT is a digital asset that can be in the form of art, music, videos, or more. They are purchased and sold online, frequently using cryptocurrency. They have become an increasingly popular method of buying and selling digital artwork.

15. NFTs exist on a blockchain, which is a distributed public ledger that records transactions. NFTs are typically held on the Ethereum blockchain. An NFT is created or "minted" from digital objects that represent both tangible and intangible items, including collectibles, virtual avatars, and graphic art. Essentially, "NFTs are like physical collector's items, only digital. So instead of getting an actual oil painting to hang on the wall, the buyer gets a digital file instead." *What Is an NFT? Non-Fungible Tokens Explained*, Forbes Advisor (May 10, 2024), https://www.forbes.com/advisor/investing/cryptocurrency/nft-non-fungible-token/.

16. Blockchain technology and NFTs give artists and content creators, like Plaintiff, a unique opportunity to monetize their wares. For instance, artists no longer have to rely on galleries or auction houses to sell their act. Rather, the artist can sell it directly to the consumer as an NFT, which also lets them keep more of the profits. *What Is an NFT? Non-Fungible Tokens Explained*, Forbes Advisor (May 10, 2024), https://www.forbes.com/advisor/investing/cryptocurrency/nft-non-fungible-token/.

17. After being diagnosed with and surviving brain cancer, in his recovery stage after a four-year battle, Plaintiff developed an interest and skill in art. Plaintiff channeled this newly-found interest and skill into a passion for creating digital art or Non-Fungible Tokens ("NFTs").

18. As a result of his efforts, within a very short period, Plaintiff became the largest NFT artist on the Binance Smart Chain in terms of minted NFTs, collections created, and fully minted

collections with 10,000 pieces or more. He has created six incredibly successful collections.

19. Plaintiff created user accounts on the X platform and utilized the platform to not only further develop his cryptocurrency and NFT community, but also promote his NFT projects. Plaintiff paid for a premium subscription of at least one user account.

20. Plaintiff, his content, and his work was increasingly popular on the X platform, garnering the support and following of several high-profile celebrities, including actor and professional wrestler John Cena and rapper and record producer Calvin Cordozar Broadus Jr., professionally known as Snoop Dogg.

21. An example of Plaintiff's success is the waitlist for his upcoming NFT project which contains thousands of individuals waiting to purchase his NFT. The account associated with this project has been suspended.

22. Plaintiff's multiple accounts, including @nftdemon_420, @gremlin_society, @badassdoggos, @patrolcrypt0, @schnauztrouse, @gamingshibanfts and @cryptopuppy420 have been suspended without any proper explanation or justifiable reason given to Plaintiff and without any ability to appeal, contrary to X's Terms, company policies, and representations. Despite thirteen (13) individual and separate attempts to appeal just his @nftdemon_420 account, the attempt to appeal was unsuccessful. Plaintiff has not been given an opportunity to appeal even one of the suspensions. Every time Plaintiff attempted to fill out the appeal form, when he would try to submit the form, it would redirect back to the original form. Therefore, while it appears that X was giving Plaintiff the opportunity to appeal, it did not.

23. To date, none of Plaintiff's accounts have been permanently reinstated; although, one was temporarily reinstated on the grounds of a wrongful suspension that occurred because of an artificial intelligence bot used by the X platform to target, locate, and suspend spam accounts

24. On or around December 19, 2023, about seven (7) days after Plaintiff's @nftdemon_420 was suspended, Plaintiff received an email from Defendant X Corp., informing him that Defendant had unsuspended his account.

25. In the email, Defendant X Corp. provided that "[w]e're writing to let you know that we've unsuspended your account. We're sorry for the inconvenience and hope to see you back on Twitter soon. A little background: we have systems that find and remove multiple automated spam accounts in bulk, and yours was flagged as spam by mistake. Please note that it may take an hour or so for your follower and following numbers to return to normal."

26. Plaintiff's account was reinstated and he resumed normal activities on the account until the final suspension in April 2024, which took place without the opportunity to appeal.

27. When Plaintiff's account was temporarily reinstated, Plaintiff continued to conduct business on the X platform and was in the process of developing a waiting list for an upcoming project, which included thousands of individuals, a project that was likely to generate at least hundreds of thousands of dollars in revenue.

28. However, in April 2024, the @nftdemon_420 account was suspended.

29. X's suspension of Plaintiff's accounts without the opportunity to appeal led to Plaintiff being effectively and completely deprived of his main source of income and a substantial part of his livelihood while Defendant X has continued to benefit from his content and business by continuing to receive advertising revenue from his generated content.

30. Defendant's Terms of Service provide that: "[w]e provide the Services on an "AS IS" and "AS AVAILABLE" basis, and we disclaim all warranties, responsibility, and liability to you or others to the extent permitted by law. You may be exposed to offensive or harmful content posted by other users. The Services may change from time to time, and we may limit or terminate availability of the Services or particular features to you or other users at any time.."

31. While the Terms do state that X may suspend an account for any reason (despite a separate provision that includes a multi-pronged policy), the Terms of Service also expressly state that a user whose account is suspended will be given an opportunity to appeal the suspension. There are no exceptions to this right to appeal.

32. At no time was Plaintiff ever provided an opportunity to appeal even one of the suspensions of his accounts.

33. Plaintiff believes on information and good faith belief, and hereon alleges, that Defendant X never intended to honor its appeal policy and knew that it had no intention of doing so when Plaintiff registered to use the X services and when he paid for a premium subscription.

34. Defendant X has consistently taken a public and contractual position that it will provide this opportunity to appeal; X has never taken a public or specific position with prospective or current users that it does not intend to honor its appeal policy, as provided for in its Terms of Service. However, Plaintiff alleges that its internal practices are to deny users this contractual right.

35. Plaintiff purchased a premium subscription for at least one of his user accounts which was unilaterally suspended by X, and he did not receive the right to appeal, as the Terms of

Service required. Defendant X retained the benefit of the bargain without abiding by its own contractual obligations

36. Further, X has continued to profit off of Plaintiff's content, his intellectual property.

37. By suspending Plaintiff's user accounts without the opportunity to appeal, Defendant has terminated Plaintiff's license to use X's software. However, X has continued to retain a license to Plaintiff's content, extracting a financial benefit from such content and continuing to generate advertising revenue off the content.

38. X is an online social media platform that utilizes third-party advertising as its predominant source of revenue. Advertisers will utilize the platform to promote their products and services, which allows greater reach to certain demographics than traditional advertising.

39. This form of digital advertising includes targeted ad placement that allows different brands to cater to different audiences. Targeted ad placement involves advertisers selecting specifically in which area or which context advertisers would like their ads to appear on. For example, users that interact with cryptocurrency or NFT content will see cryptocurrency or NFT-related advertisements as they view cryptocurrency or NFT-related content. Advertisements appear repeatedly throughout the feed as users view this content.

40. Posts from suspended accounts are not permanently removed from the X Corp. platform. Rather, if an account is found to be in violation of the rules, any posts from that account will be hidden behind a notice that the post is from a suspended account. *See* X Help Center, Notices on X and what they mean, https://help.x.com/en/rules-and-policies/notices-on-x#:~:text=Notice%20for%20a%20post%20from,be%20hidden%20behind%20a%20notice. However, the post itself is not removed. Therefore, users on the X platform are still able to see Plaintiff's content alongside any advertising that appears on a user's feed. Plaintiff's

content directly allows and facilitates X's continued revenue generation even though Plaintiff's accounts have been suspended.

41. X continues to derive and retain a benefit from Plaintiff's content even though Plaintiff's accounts have been wrongfully terminated for no reason or explanation and without the contractual right to appeal.

42. Further, Plaintiff on information and good faith belief, alleges that X's Terms of Service and its public statements are designed to induce users to register for an account on the X platform, even though X has no intention of honoring the appeals policy clearly laid out in its Terms of Service, deliberately deriving financial profit from that user's account even in the event of the termination.

43. X's Terms of Service expressly include a licensing provision. Pursuant to this provision, the user shall "retain ownership and rights to any of your Content you post or share, and you provide us with a broad, royalty-free license to make your Content available to the rest of the world and to let others do the same. Conversely, we provide you a license to use the software we provide as part of the Services, such as the X mobile application, solely for the purpose of enabling you to use and enjoy the benefit of the Services."

44. However, the licensing provision does not state that if the user's account, or contract, is terminated, then the license shall be terminated as well. In fact, the opposite occurs.

45. X, based on its own conflicting, confusing, and misleading Terms of Service, not only possesses the right to terminate its services to any user at any time, but it also does not and has never had an intention of complying with, and if a user's account is, in fact, suspended for any reason, X shall retain its license to that user's content and continue to generate revenue from that user's intellectual property.

46. Beyond the continued usage of a terminated user's intellectual property, X has a provision in its Terms that effectively prohibits users from linking to third party social media platforms, even if those users have active and large followings on other platforms. This restricts users' visibility to only the X platform and confines their followers to only their X account. In the event that an account is wrongfully or unilaterally suspended, a content creator who has a significant following on X would systematically lose all visibility from its followers, as its followers would not have access to links to this user's other social media accounts.

47. This provision is designed to prevent competition with X and its Services, to prevent users from utilizing other platforms or benefitting from other platforms while they are active on the X platform.

48. Plaintiff did not violate X's Terms, policies, or rules. Plaintiff was denied the right to appeal his suspension. Due to X's failure to abide by its contractual obligations, Plaintiff has lost his predominant source of income and livelihood.

49. Plaintiff alleges herein that had he known that Defendant X had no intention of honoring the appeals policy laid out in its Terms of Service, and that, contrary to what X advertises both in Terms and its public position, X does not follow a multi-pronged suspension policy or allow users the right to appeal a suspension, Plaintiff would not have chosen X as an online platform to build his business. Plaintiff would not have registered for X user accounts, or purchased a premium subscription, if he had known that his account could be suspended for any reason at all with no ability to appeal.

50. Plaintiff's suspension from the X platform has severely damaged his cryptocurrency and NFT business, including his upcoming NFT projects. As more time passes without access

to his accounts and ability to promote his upcoming NFT projects or generate momentum, he continues to lose any prospective financial advantage or profits he had earned and was projected to earn while active on the X platform.

51. For the aforementioned reasons, Plaintiff brings this Complaint against Defendant X, seeking injunctive and compensatory relief for damages he has suffered and continues to suffer as a result of X's actions.

### FIRST CAUSE OF ACTION: PROMISSORY ESTOPPEL

### (Against Defendant X Corp.)

52. Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

53. X, through the company's practices and procedures, its Terms, and notifications on Plaintiff's suspensions, made unambiguous personal promises and assurances to Plaintiff for an extended period, including but not limited to the following:

   a. X reserve[s] the right to remove Content that violates the User Agreement, including for example, "copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment." X Terms of Service, Main Page, September 29, 2023.

   b. "X's mission is to give everyone the power to create and share ideas and information, as well as express their opinions and beliefs without barriers. Free expression is a human right – we believe that everyone has a voice, and the right to use it." X Help Center, Abuse and Harassment, March 2024.

    c. "We also believe that criticism of institutions, practices, and ideas is a fundamental part of the freedom of expression and thus, we will not take action on such critical commentary." X Help Center, Abuse and Harassment, March 2024.

    d. "Your account is suspended. After careful review, we determined your account broke the X Rules. Your account is permanently in read-only mode, which means you can't post, Repost, or Like content. You won't be able to create new accounts. If you think we got this wrong, you can submit an appeal." X Suspension Notice

    e. "We received your request to have your account reinstated. Please respond to this email with the reason you believe your account suspension was in error and/or the reason you are requesting an appeal." X Support Email.

    f. Plaintiff received an email from X's Support Account requesting additional information on his appeal. When Plaintiff attempted to access the link and submit the form, regardless of what he entered into the form, he continued to receive the original email from the X Support Account.

    g. In total, Plaintiff submitted 13 individual and separate appeals from April 2 until April 18. X did not respond to any of them, give him an explanation on why his accounts were suspended, or why they have yet to be reinstated.

    h. X purportedly gave Plaintiff an opportunity to appeal on the guise that the company was willing to review the basis on which his accounts were suspended and possibly reinstate. However, such representations were a ruse.

54. In its Terms, which Plaintiff accepted upon registration, X has a clearly established appeals policy for suspended user accounts.

55. However, when Plaintiff's accounts, including at least one paid account, was suspended, Defendant X did not comply with its own appeals policy and did not give Plaintiff an opportunity to appeal.

56. Defendant X's promise of an appeal policy in its Terms of Service and very public communication of that policy to prospective and active users constituted a clear and unambiguous promise that was an integral part of the parties' contract.

57. X's specific and general assurances as to Plaintiff's ability to appeal the suspension of Plaintiff's other accounts were clear and unambiguous in their Terms.

58. X's specific promises on Plaintiff's ability to appeal the suspension overrode the provision of X's Terms of Service which allows for suspension at any time for any reason.

59. Plaintiff relied on X's general and specific promises and assurances by not only registering as a user but also continuing to use the platform and build his business on the platform.

60. X's specific and general promises of an appeals policy induced Plaintiff to use the X online platform instead of other available platforms for the purposes of building a community and business.

61. Plaintiff's reliance on X's general and specific promises and assurances was reasonable and foreseeable.

62. Plaintiff relied on X's promises of an appeals policy to his detriment.

63. Plaintiff was injured by his reliance on X's general and specific promises.

64. As a direct and proximate result of X's promises and assurances and Plaintiff's reasonable reliance as described herein, Plaintiff has been damaged in an unknown amount at the minimum jurisdiction of this court to conform to proof at trial.

65. WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CAUSE OF ACTION: UNJUST ENRICHMENT

### (Against Defendant X Corp.)

66. Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

67. Defendant X received the benefit of Plaintiff's purchase of at least one paid subscription for his accounts.

68. X continues to derive and retain a benefit from Plaintiff's content and intellectual property even though Plaintiff's accounts have beenterminated with no right to appeal, contrary to the partes' contract, X's Terms of Service..

69. Even though X has unilaterally terminated Plaintiff's accounts, and therefore, the contracts between the parties, X retained a license over Plaintiff's intellectual property.

70. X has continued to derive profits from Plaintiff's intellectual property even though X unilaterally, and without cause, terminated the contract between the parties, violating the contract by failing to allow Plaintiff an opportunity to appeal the suspension.

71. X continues to receive advertising revenue from Plaintiff's intellectual property and content, even though X knew at the time that Plaintiff registered for the content that there was a likely possibility that Plaintiff could be wrongfully suspended by either an artificial intelligence system or X's confusing and conflicting Terms of Service.

72. Any profits traceable to Plaintiff's cryptocurrency and NFT business, cryptocurrency expertise, and artwork are a benefit conferred on X that it should not have received.

73. X has been unjustly enriched and, therefore, it would be inequitable for X to be allowed to retain the benefits of Plaintiff's content and business activity without being ordered to pay the reasonable value therefor, together with interest thereon at the legal rate.

74. As a direct and proximate result of the benefit conferred on X and X's subsequent unjust enrichment, Plaintiff has been damaged in an unknown amount at the minimum jurisdiction of this court to conform to proof at trial.

75. WHEREFORE, Plaintiff prays for judgment as set forth below.

### THIRD CAUSE OF ACTION: PROMISSORY FRAUD

### (Against Defendant X Corp.)

76. Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

77. In its Terms and public statements, X repeatedly made false and misleading representations of policy to Plaintiff, representations that it knew were untrue. These include public and repeated statements, the Terms of Service, and direct messages to Plaintiff that he would be given an opportunity to appeal his suspension according to company policy. These representations were not true and X knew that they were not true.

78. None of X's specific and general representations to Plaintiff, including its contractual term of an appeals policy, were true. Every one of these promises was false at the time X made it, and X knew they were false. When it made these representations, X knew that it did not have any intention to allow Plaintiff the opportunity to appeal.

79. X made a promise to Plaintiff to perform an obligation under the Terms of Service at the time that the parties entered into the agreement, when Plaintiff registered for the accounts.

80. X knew that it had not intention of performing the promise it made to Plaintiff.

81. X's promise was made for the purpose of inducing Plaintiff's registration for the user accounts, Plaintiff's usage of the X online platform, and Plaintiff's purchase of premium subscriptions for his user accounts.

82. Plaintiff justifiably relied on X's false promise of an appeals policy and right to appeal as that had been X's consistent position on account suspensions, both publicly and highlighted in its Terms of Service.

83. Plaintiff was damaged as a result of X's false promise.

84. As a direct and proximate result of X's false promise, Plaintiff suffered severe financial loss, goodwill, and damage to his brand, which would not have occurred had he known that X had never intended to keep its promises. X's false promises proximately caused Plaintiff damages in an unknown amount at the minimum jurisdiction of this court to conform to proof at trial.

85. X's fraudulent conduct was committed and/or authorized by one or more officers, directors, or managing agents of X, who were acting on behalf of X and within the scope of their duties.

86. Plaintiff is informed and believes, and on that basis alleges, that X acted with oppression and malice and with intent to injure Plaintiff, that X acted with willful and knowing disregard of Plaintiff's rights in a manner that would be looked down upon and despised by reasonable people, that X intentionally engaged in this activity with the intent to harm Plaintiff. Plaintiff is entitled to punitive damages in an amount to be established during the course of litigation.

87. WHEREFORE, Plaintiff prays for judgment as set forth below.

## FOURTH CAUSE OF ACTION: FALSE ADVERTISING AND UNFAIR BUSINESS PRACTICES (VIOLATION OF CAL. UNFAIR PRACTICES ACT – CAL. BUS. & PROF. CODE §§17000 ET SEQ.)

### (Against Defendant X Corp.)

88. Plaintiff repeats and re-alleges herein by reference the allegations of the foregoing paragraphs, as if set forth at length herein.

89. X engaged in unfair business practices by retaining a license to Plaintiff's intellectual property when it unilaterally terminated the parties' contract without cause and without the opportunity to appeal, a clear violation of its Terms and the parties' contract.

90. X engaged in unfair business practices when it made a specific and general promise to Plaintiff that he would have the opportunity to appeal the suspension of his accounts when it knew that he would not have such opportunity and X would not provide him with that opportunity.

91. X engaged in fraudulent business practices when it expressly represented to users and Plaintiff, both publicly and in its Terms, that it users will have an opportunity to appeal account suspensions.

92. X's false and misleading representations and unfair and fraudulent practices led to an inducement of Plaintiff's usage of the X platform, development of a livelihood, and then Plaintiff's suspension from the X platform with no recourse to appeal. All this while X continues to derive a financial benefit from Plaintiff's terminated livelihood.

93. As a direct and proximate result of X's unfair and fraudulent practices and false and misleading representations, Plaintiff suffered significant financial harm by losing the

ability to continue promotions for upcoming projects, develop existing ones, and build the waiting lists for the upcoming projects.

94. As a direct and proximate result of X's unfair and fraudulent practices and false and misleading representations, Plaintiff suffered damages in an unknown amount at the minimum jurisdiction of this court to conform to proof at trial.

95. WHEREFORE, Plaintiff prays for judgment as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief.

a. Award of compensatory damages, including statutory damages where available to Plaintiff against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b. Grant of injunctive relief to restore Plaintiff's access to his X user accounts and prevent X from suspending Plaintiff's accounts in the future without both: (1) a reasonable and justifiable explanation compliant with its Terms, policies, and company practices; (2) an independent third-party review of any and all suspensions and the provided justifications; and (3) the good faith ability and opportunity to appeal any and all suspensions.

c. Award of punitive damages on the causes of action that allow for them and in an amount that will deter Defendants and others from like conduct;

d. Award of attorneys' fees and costs, as allowed by law including, but not limited to, California Code of Civil Procedure Section 1021.5;

e. Award of pre-judgment and post-judgment interest, as provided by law, and;

f. Such other, further, and different relief as the Court deems proper under the circumstances.

## REQUEST FOR TRIAL BY JURY

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted, this 22th day of January 22, 2025

                                                  */Donna Etemadi/*

                                                  Donna Etemadi
                                                  Attorney for Plaintiff