UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEREMY RYAN,

    Plaintiff,

    v.

X CORP.,

    Defendant.

Case No. 24-cv-03553-WHO

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 48

Defendant X Corp. (formerly Twitter, hereafter "X") moves again to dismiss plaintiff Jeremy Ryan's challenge to the suspension of several of his X accounts in 2023. Four claims remain: promissory fraud, promissory estoppel, unjust enrichment, and an unfair business practices claim. All are barred by X's Terms of Service (the "Terms"), which waive all liability to X arising from users being unable to access their accounts.[1]  Ryan's unjust enrichment claim is also barred by section 230 of the Communications Decency Act of 1996 (hereafter, "section 230"). Ryan has been unable to cure the fundamental problems with his case. X's motion is GRANTED and this case is dismissed in its entirety.

**BACKGROUND**

The parties are familiar with the facts of this case. Ryan's allegations in the Second Amended Complaint are largely unchanged from the previous two complaints. *See* Second Amended Complaint ("SAC") [Dkt. No. 47]. A more complete factual background can be found in the previous two orders granting X's earlier motions to dismiss. *See* Dkt. Nos. 29, 41. The

---

[1] X seeks judicial notice of the Terms. Dkt. No. 49. Ryan does not oppose. The contents of the Terms are not subject to reasonable dispute. They are also incorporated by reference through the parties' papers, and I have already taken judicial notice of them. The defendant's Request for Judicial Notice is GRANTED.

following briefly describes the circumstances giving rise to his claims and points out where the SAC varies from the previous two complaints.

Ryan's promissory estoppel and promissory fraud claims assert that X, through its practices and procedures, Terms, and notifications sent to Ryan after his accounts were suspended, made "unambiguous personal promises and assurances" to him about its content moderation policies that it did not honor. SAC ¶¶ 52-65 (Promissory Estoppel) & ¶¶ 76-86 (Promissory Fraud). The "unambiguous personal promises and assurances" he identifies are statements that appear in X's Terms, in its Help Center, and in emails he received after his accounts were suspended and after he challenged those suspensions. Ryan also alleges that X misrepresented its appeals process to him and that he relied, to his detriment, on the promise that he could appeal his account suspension. He characterizes X's account suspension appeal procedure as a "ruse." SAC ¶ 53(h). This theory—that X promises its users the ability to appeal any account suspensions but does not fulfill that promise—now undergirds Ryan's promissory estoppel and fraud claims.[2]

X's Terms at various points direct users toward its Help Center's "About suspended accounts" webpage, which provides information for users whose accounts have been suspended, including that they can "file an appeal."[3] On its Help Center page, X states that "[i]f you are unable to unsuspend your own account using the instructions above and you think that we made a mistake suspending or locking your account, you can appeal. First, log in to the account that is suspended. Then, open a new browser tab and file an appeal." The Help Center includes a hyperlink to the "file an appeal" page.[4]

---

[2] In his first two complaints, Ryan's theory of promissory fraud and estoppel was that X had promised—through its Terms and through representations by the company—that it would not suspend users' accounts in the way it suspended Ryan's and that he had relied on that promise to his detriment. *See* Order Granting Motion to Dismiss First Amended Complaint ("FAC Order") [Dkt. No. 41] 7-8. I explained in the Prior Order that Ryan had not plausibly alleged promissory fraud or estoppel because he had not alleged a particular "promise" by X not to suspend his accounts. *Id.* In the SAC and in his response to X's Motion, Ryan focuses on X's appeals process as his theory of promissory fraud and estoppel.

[3] X Help Center, "How to unsuspend your X account," archived web page, January 2023, https://web.archive.org/web/20230927170107/https://help.twitter.com/en/managing-your-account/suspended-x-accounts

[4] While the Help Center page on how to unsuspend an X account is available through the

2

The SAC includes contradictory allegations about the nature and status of Ryan's appeals. At one point, Ryan claims that "at no time was [he] ever provided an opportunity to appeal even one of the suspensions of his account," despite X representing that he would be able to. *See* SAC ¶¶ 31-34, 55. Elsewhere in the same complaint, he explains that after his account was suspended and he requested that it be reinstated, he "received an email from X's Support Account requesting additional information on his appeal." SAC ¶ 53(e). He also states that "[i]n total, [Ryan] submitted 13 individual and separate appeals from April 2 until April 18," SAC ¶ 54(f)-(g). He alleges that "[w]hen [he] attempted to access the link and submit the form, regardless of what he entered into the form, he continued to receive the original email from the X Support Account." *Id.* ¶ 53(f).

Ryan's unjust enrichment claim has changed slightly. While the core of it remains that X has unfairly retained profits from advertising associated with his suspended accounts, *see* SAC ¶ 71, he now adds that X received the benefit of his "purchase of at least one paid subscription for his accounts" in addition to "continu[ing] to derive and retain a benefit from [Ryan's] content and intellectual property even though [Ryan's] accounts have been terminated with no right to appeal[.]" SAC ¶¶ 68-69. He still claims that "[a]ny profits traceable to [Ryan's] cryptocurrency and NFT business, cryptocurrency expertise, and artwork are a benefit conferred on X that it should not have received." SAC ¶ 72. He does not otherwise explain why he believes that X's receipt of his payment for a "premium" subscription is money wrongfully gotten.

Finally, Ryan reasserts the same general allegations described above—that X made promises about its account suspension and related appeal process that it did not fulfill—in support of his claim for false advertising and unfair business practices in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 1700, *et seq.* SAC ¶¶ 88-95.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim. A claim may be dismissed only if it appears beyond doubt that the plaintiff

---

"Wayback Machine," the actual appeals page (at least as it appeared in 2023) does not appear to be available.

3

can prove no set of facts in support of his claim which would entitle him to relief." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (citation and quotation marks omitted). Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *Twombly*, 550 U.S. at 555 (quotations and citation omitted).

In considering a motion to dismiss, the court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (citations and quotations omitted). However, a court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ..., [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**DISCUSSION**

**I.    X'S TERMS OF SERVICE BAR RYAN'S CLAIMS**

Despite three complaints, Ryan has been unable to show how any of his claims could proceed in light of X's Terms of Service. The Terms provide that the platform may stop providing its services to users for any or no reason without liability to the user. They state:

4

> We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, *limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you* . . .
>
> . . . [X] *[s]hall not be liable* for any indirect, incidental, special, consequential or punitive damages, or any loss of profits or revenues" . . . resulting from the user's "inability to access or use the services."

X's Request for Judicial Notice [Dkt. No. 33-2] Ex. A ("Terms") at pp. 3-6 (emphasis added). Throughout this litigation, Ryan has conceded that the Terms, which are a part of X's User Agreement, constitute a legally binding contract to which he is a party. SAC ¶¶ 41-45; *see* FAC Order 3-4.

All of Ryan's claims arise from his "inability to access or use [X's] services." Ryan's only argument that the Terms do not bar his claims is that California Civil Code section 1668 nullifies X's liability limitation clause. This fails to salvage his claims for at least two reasons. First, section 1668 would only apply if Ryan plausibly alleged fraud against X. He has not. Second, even if he had, section 1668 could only apply to salvage Ryan's promissory fraud claim; it is inapplicable to the promissory estoppel, unjust enrichment, and UCL claims. Ryan effectively concedes that those other claims are barred by the Terms; he makes no argument to the contrary.

### A.     Section 1668

In California, there is an exception to the application of liability limitation clauses: California Civil Code section 1668 provides that "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud . . . or violation of law, whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668. California courts have repeatedly interpreted the statute as rendering limitation of liability clauses unenforceable to the extent that they would insulate an individual or entity from liability for fraud, intentional tort liability, or gross negligence. *See e.g., New England Country-Foods, LLC v. Vanlaw Food Products, Inc.*, 87 F.4th 1016, 1019-20 (9th Cir. 2023); *WeBoost Media S.R.L. v. LookSmart Ltd.*, No. C 13–5304 SC, 2014 WL 2621465, at *9–10 (N.D. Cal. June 12, 2014); *City*

*of Santa Barbara v. Superior Court*, 41 Cal. 4th 747 (2007).[5] That said, where there are no plausible allegations of fraud, intentional tort liability, or gross negligence, then the constraint on liability-limitations is inapplicable. *See e.g., Block Scientific, Inc. v. True Diagnostics, Inc*., 2022 WL 485010, at *9 (S.D. Cal. Feb. 16, 2022) (holding that section 1668 does not render a limitation of liability provision unenforceable where the plaintiff "has not satisfied the heightened pleading requirements of fraud" and "has not adequately alleged that Defendants violated the law").

In *Santa Barbara*, the only case that Ryan cites in support of his theory that section 1668 nullifies X's limitation of liability clause, the court considered the effect of section 1668 on a contractual provision that sought to release the City of Santa Barbara (the "City"), from liability for future gross negligence. *See Santa Barbara*, 41 Cal. 4th 747. There, the mother of a developmentally disabled 14-year-old girl had signed an application form that released the City from liability for "any negligent act" related to the child's participation in the City's summer camp for developmentally disabled children. Her daughter drowned while attending the camp and the parents sued the City. The California Court of Appeal held that "(1) the agreement in the application form was effective and enforceable insofar as it concerned defendants' liability for future ordinary negligence, but (2) the release of liability clause for future gross negligence was unenforceable." *Id*. at 751 (emphasis added). On appeal, the Supreme Court of California affirmed the second conclusion.

Since *Santa Barbara*, other California courts have considered the appropriate scope of liability-limiting clauses like the one at issue here and held that section 1668 renders liability waivers unenforceable to the extent that those waivers would insulate a party from fraud, intentional tort liability, or gross negligence. *See e.g., WeBoost Media*, 2014 WL 2621465, at *9-10. But where there are no plausible allegations of fraud, intentional tort liability, or gross negligence, the constraint is inapplicable. *See e.g., Block Scientific, Inc*., 2022 WL 485010, at *9 (holding that section 1668 does not render a limitation of liability provision unenforceable where

---

[5] *See Ryan v. X Corp.*, No. 24-CV-03553-WHO, 2024 WL 5058526, at *3-5 (N.D. Cal. Dec. 9, 2024), for further detail on how the Ninth Circuit interpreted section 1668 in *New England Country Foods, LLC*, 87 F.4th at 1019-20.

the plaintiff "has not satisfied the heightened pleading requirements of fraud" and "has not adequately alleged that Defendants violated the law").

### B. Ryan Has Not Plausibly Alleged Fraud

The elements of a promissory fraud claim are (1) "a promise clear and unambiguous in its terms" (2) that is false; (3) "that the promisor know of the falsity when making the promise;" (4) "reliance by the party to whom the promise is made" (5) that is "both reasonable and foreseeable;" and (6) resulting injury. *Aceves v. U.S. Bank, N.A.*, 192 Cal. App. 4th 218, 225, 231 (2011). Under Rule 9(b), parties must "allege fraud with particularity," including the "who, what, when, where, and how of the misconduct charged." *See Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 958 (9th Cir. 2023).

In his last complaint, Ryan focused his fraud allegations on X's purported misrepresentations about its content moderation policies. Now he argues that it was X's representations about its appeal process that were fraudulent. This theory of liability fares no better. Ryan has still not plausibly alleged fraud against X. As a result, Section 1668 does not apply, and X's Terms limit its liability for all of Ryan's claims.

#### 1. X's Promises About its Account Suspension Appeal Process

In prior iterations of the complaint and in arguing against prior motions to dismiss, Ryan grounded his promissory fraud claim in what he argues were promises by X to not suspend his account. I noted that what Ryan called "clear and unambiguous promises not to suspend his account" were far from that. *See* FAC Order 7. Ryan has since reoriented his promissory fraud claim to focus on X's representations around its account suspension appeals policy.[6]

X's Terms provide that if users disagree with an account suspension and are unable to reactivate their account themselves, they "can file an appeal"; the Terms direct users to X's Help

---

[6] Ryan still claims that X's representations about its content moderation policies were fraudulent. After I explained that he had not plausibly alleged fraud with respect to that theory of liability, he focused on X's representations about the availability of appeals after account suspensions rather than including more details about X's purported fraud with respect to how it decides to suspend accounts. I incorporate my analysis in the FAC Order that explains why those allegations also do not support a fraud claim. *See* FAC Order 7-9.

7

Center, which links them to a site where they can submit an appeal. *See* Terms at pp. 4, 7; *see also* X Help Center ("About suspended accounts") (archived web page, January 2023). Ryan claims that "[i]n its Terms and public statements, X repeatedly made false and misleading representations of policy . . . that it knew were untrue." SAC ¶ 77. These "include[d] public and repeated statements, the Terms of Service, and direct messages to Plaintiff that he would be given an opportunity to appeal his suspension according to company policy." *Id.* According to Ryan, "[t]hese representations were not true and X knew they were not true[,]" and in fact, "X knew that it did not have any intention to allow Plaintiff the opportunity to appeal." *Id.* He asserts that he "justifiably relied on X's false promise of an appeals policy and right to appeal as that had been X's consistent position on account suspensions, both publicly and highlighted in its Terms[.]" *Id.* ¶ 82. He claims that he was damaged as a result of X's actions in the form of "severe financial loss, goodwill, and damage to his brand, which would not have occurred had he known that X never intended to keep its promises." *Id.* ¶ 84. Finally, he contends that "X acted with oppression and malice and with intent to injure Plaintiff, that X acted with willful and knowing disregard of Plaintiff's rights in a manner that would be looked down upon and despised by reasonable people," and that X did all of this with an "intent to harm" him. *Id.* ¶ 86.

Ryan's claim utilizes the right keywords to outline a fraud claim but his complaint is devoid of alleged facts that support his theory. In fact, some of his allegations contradict it. Taking the allegations in the SAC to be true, it appears that Ryan *was* afforded the opportunity to appeal, meaning that X did not renege on its promise that users could appeal account suspensions. *See* Terms at 4, 7; Help Center ("About suspended accounts"). Although at one point in the SAC Ryan claims that "at no time was [he] ever provided an opportunity to appeal even one of the suspensions of his account," despite X representing that he would be able to (*see* SAC ¶¶ 31-34, 55), elsewhere he explains that after his account was suspended and he requested that it be reinstated, he "received an email from X's Support Account requesting additional information on his appeal," SAC ¶ 53(e). He also states that "[i]n total, [he] submitted 13 individual and separate appeals from April 2 until April 18," SAC ¶ 54(f)-(g).

X points out these contradictions in its motion. *See* X Motion 18-20. Ryan stated that

8

1  these opportunities were not real opportunities to appeal because if they were, "he would have at
2  least had the opportunity to regain access to his accounts." Ryan Opposition ("Oppo.") [Dkt. No.
3  56] 10.  That is specious; an appeal is a request for a different decision.  X does not guarantee that
4  an appeal will result in a favorable decision for the user whose account was suspended.  It does not
5  lay out a particular series of steps that constitute the appeal process, or guarantee users any kind of
6  process.  At oral argument, his counsel clarified that Ryan's theory is that the appeals process does
7  not function properly to process the appeals that he submitted.  This is consistent with Ryan's
8  allegation that "[w]hen [he] attempted to access the link and submit the form, regardless of what
9  he entered into the form, he continued to receive the original email from the X Support Account."
10  SAC ¶ 53(f); *id.* ¶ 22.

11  All that said, Ryan identifies no promise from X that a particular series of steps would be
12  followed during the appeal process, and he can only speculate that his appeals were not
13  considered.  X promised that users "can" file appeals.  X Terms at pp. 4, 7.  The allegations in the
14  SAC make clear that Ryan did just that.  The Help Center page to which X users seeking to appeal
15  were directed also contained minimal information—just a statement that users could appeal
16  account suspensions in an effort to "unsuspend" their account, if other, preliminary steps did not
17  result in account reactivation.  *See* X Terms; X Help Center Page ("About suspended accounts").[7]
18  It also provided a hyperlink to where users could "file an appeal."  *See id.*

19  If Ryan's speculation is true, then X's misdeed is providing an unsatisfactory or flawed
20  appeals process.  That does not amount to fraud.  Ryan says that X "take[s] a public and
21  contractual position that it will provide [an] opportunity to appeal." SAC ¶ 34.  The facts alleged
22  show that X's actions with respect to his account suspension were not inconsistent with that
23  position.  By his own telling, Ryan appealed his account suspensions 13 times.  *Id.* ¶¶ 53-54.  At
24  one point, he received an email from X Support asking for more information about his appeal.  *Id.*
25  ¶ 53(e).  It stands to reason that such an email would not have been sent had Ryan not been able to

---

[7] X Help Center ("About suspended accounts"), archived web page, January 2023, https://web.archive.org/web/20230927170107/https://help.twitter.com/en/managing-your-account/suspended-x-accounts

file an appeal. Ryan has not plausibly identified a false statement, much less one that X knew to be false.

### 2. Damages

But if Ryan had plausibly alleged that X misrepresented its appeals policy, he still could not show damages. He cannot plausibly allege that if his appeal been processed perfectly, his accounts would have been reinstated.

*Minor v. Laggner*, No. CV 18-731 PA (KSX), 2018 WL 10498450, at *7 (C.D. Cal. Dec. 10, 2018), a breach of contract case, is instructive. There, the court held that plaintiff had failed to allege damages arising from defendants' false statement that they secured third-party financing where, even if the statement was true, "there was no guarantee" the company's board of directors "would have accepted" the financing proposal. Like the plaintiff in *Laggner*, Ryan cannot show that, had X offered a perfect appeal process, his account would have been reinstated.[8]

***

All of Ryan's remaining claims are barred by X's Terms, which limit its liability for all user claims arising out of its decisions to limit users' access to its services. Section 1668 does not apply to salvage his promissory fraud claim because he has not plausibly alleged fraud against X. Aside from invoking section 1668, Ryan offers no argument why his claims would not be barred by X's limitation liability clause.

## II.  SECTION 230 BARS RYAN'S UNJUST ENRICHMENT CLAIM

Ryan's unjust enrichment claim remains largely unchanged from the First Amended Complaint (where I held that it was barred by section 230 because it sought to hold X liable for publishing activity). Now he alleges that he paid for a premium X account. This allegation does not make a material difference.

To invoke section 230 as an affirmative defense, X must show that Ryan's allegations

---

[8] While I do not reach the question of reliance, because Ryan's fraud claim suffers from more acute problems, I agree with X that Ryan could not allege that he relied upon any direct email notices he received from X when he created his X accounts. Those direct communications came years after he created his accounts. He could only claim to have relied upon X's representations about its appeals policy for representations in the Terms and in the Help Center, both of which were available to Ryan when he created his X accounts. And even that reliance is questionable.

10

establish: (1) that X is a "provider . . . of an interactive computer service"; (2) that the challenged content is "information provided by another information content provider"; and (3) that Ryan's claims "treat" X as the "publisher or speaker" of that information. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024) (laying out the elements of the test for section 230 immunity as iterated by the Ninth Circuit in *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), the "*Barnes* test").

The first two prongs of section 230 immunity are easily met. X Corp. is an "interactive computer service" provider and Plaintiff's X accounts and content are "information provided by another information content provider." 47 U.S.C. § 230(c)(1); *see also* FAC Order at 9-11; Oppo. 9-10.[9] With respect to the third prong, Ryan claims that "X continues to derive and retain a benefit from Plaintiff's content and intellectual property even though Plaintiff's accounts have been terminated with no right to appeal," insofar as "X continues to receive advertising revenue from Plaintiff's intellectual property and content[.]" SAC ¶¶ 70-71. This arises out of X's publishing decisions.

Ryan does not allege that X promised that it would cease all advertising activity connected to his accounts in the event that it suspended those accounts. He alleges that X's decision to continue publishing ads connected to his accounts was wrongful and that its retention of associated revenue—and, now, the revenue associated with his premium account—is unjust. At its core, this claim challenges X's publishing activity. In addition to being barred by X's Terms, it is barred by section 230.[10]

**CONCLUSION**

---

[9] *See* FAC Order 8-10 for further discussion of the *Barnes* elements.

[10] In light of the refocused allegations in the SAC, it very well may be that section 230 bars Ryan's other claims as well. I previously declined to extend section 230 protection to X with respect to Ryan's promissory fraud, promissory estoppel, and UCL claims because his theory of liability appeared to be that X had promised to treat his accounts in a particular way, and had failed to. I gave Ryan two opportunities to amend his pleadings to indicate what those promises were, how they were false, and how he was damaged as a result. He points to X's Terms and to its representations on the Help Center page. This would seem to bring his other three claims within the ambit of section 230, as he is challenging X's general account suspension policies. But I need not reach the issue given that these other three claims are barred by X's Terms. *See* discussion *supra,* Section I.

11

For the foregoing reasons, X's motion is GRANTED. Ryan has had three opportunities to state a cognizable claim against X for the suspension of his accounts; he has been unable to do so. All his claims are barred by either X's Terms, section 230, or both. Further amendment would be futile and this case is dismissed in its entirety. The Clerk shall enter judgment in X's favor.

**IT IS SO ORDERED.**

Dated: June 6, 2025

William H. Orrick
United States District Judge